# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Vulnerable Adult Petition for Jack Clearman, | No. 57008-4-II |
| REBECCA CLEARMAN,<br>                              Respondent, | (consolidated with No. 57018-1-II) |
| v. | |
| ALICE JANE CLEARMAN and PETER BUCK, | UNPUBLISHED OPINION |
|                              Appellants. | |

CRUSER, A.C.J. — On December 6, 2021, Rebecca R. Clearman filed a petition for a Vulnerable Adult Protection Order (VAPO) on behalf of her 100-year-old father, Jack Clearman, against her sister, Alice Clearman.[1] A temporary order was granted that same day. Three days later, on December 9, Jack died. On January 7, 2022, the superior court held a hearing regarding the VAPO. The court made oral findings of fact and entered the VAPO with Alice Clearman and Peter Buck as the restrained parties. On April 26, 2022, the court entered a document entitled written findings of fact and conclusions of law against Alice and Peter Buck, Alice's boyfriend. Based on its factual findings, the court concluded that Alice and Peter abused and neglected Jack.

Alice and Peter appeal the superior court's January 7, 2022 and April 26, 2022 orders.

---

[1] This opinion will refer to members of the same family by their first names to avoid confusion.

We hold that the superior court erred in entering the January 7 and April 26 orders against Peter and Alice because the VAPO petition was moot.

## FACTS

### A. BACKGROUND

Jack Clearman passed away on December 9, 2021, at the age of 100. He had three children, Rebecca, Joe, and Alice. Vikki Clearman was Jack's daughter-in-law and Joe's wife. In 2015, Jack's wife passed away. Alice lived with Jack for the last six years of his life to supervise and care for him. In August 2021, Alice's boyfriend, Peter Buck, moved in. Jack did not know Peter before he moved into the house.

In 2007, Jack executed a last will and testament providing for the distribution of his assets upon his death. Jack's 2007 last will and testament devised and bequeathed his estate to his wife, and in the event of her death to his three children, Joe, Rebecca, and Alice. The will also nominated and appointed Jack's wife as the personal representative of his estate and then Joe as the first alternate, Rebecca as the second alternate, and Alice as the third alternate.

In 2018, Jack executed durable power of attorneys nominating his daughter-in-law, Vikki, as his attorney-in-fact with the full authority to manage his finances, and Rebecca as his health care attorney-in-fact. Vikki assisted Jack with paying his bills and taking care of his finances for many years prior to the appointment. In March 2021, Jack executed another financial power of attorney again nominating Vikki as his attorney-in-fact. Additionally, Jack executed a healthcare power of attorney nominating his daughter Rebecca as his attorney-in-fact.

On September 1, 2021, Jack created a revocable living trust naming Vikki as trustee.[2] Jack was the beneficiary of the trust, and Joe, Rebecca, and Alice were named as successor beneficiaries in equal shares. Jack assigned the title of his home and Georgia property to the trust, and placed all of his furniture, household goods, and personal property located on both properties into the trust as well.

On September 22, 2021, Peter sent an email to Rebecca and Vikki asking for evening and weekend care for Jack to enable Alice to take breaks. On October 1, Peter sent a follow up email asking Rebecca and Vikki to discuss overnight care. On October 4, Rebecca responded by email to Peter's message. Rebecca stated that Alice had refused any help in the home for the previous five years, and that her father did not have an extra $13,000 a month to fund evening care and pay for "house expenses, utilities, cable, insurance, taxes, and car expenses." Clerk's Papers (CP) at 28. Rebecca, who lived in Texas, further stated that a new plan for Jack's living situation was necessary, one that "honors Alice's new interest in her own life":

> We must have a new long term plan that honors Dad's need for 24 hour care which will only become more pronounced as he ages. . . .
>
> Frankly I think Dad will do extremely well in an environment with lots more people and activity, plus his own private patio for chewing. It will be an adjustment for everyone; thankfully people adjust to changes, even unwanted ones.
>
> Thank you for continuing to not bring Dad into this. I feel it best if ALL changes and inconveniences are blamed on me. I want to protect both my sibs and their significant others from any negative feelings Dad may have. Plus, legally and morally- this is my decision to make.

*Id.*

---

[2] In their declarations, Alice and Peter contended that Vikki and Joe planned an elaborate ruse to get Jack out of the house that day and take him to an estate planning lawyer to create the trust.

At some point between October 4 and October 27, Peter and Alice showed Rebecca's email to Jack and Jack thought that Rebecca wanted to move him out of the house into an institution. On October 27, 2021, Alice notified Vikki that she and Peter showed Jack Rebecca's October 4 email about moving him out of the house. Alice, asserting that she was acting on Jack's behalf, asked Vikki to provide copies of any and all legal documents Jack signed since the passing of his wife so that Jack would know who had legal powers over his person and his estate and what those powers were. On October 29, Rebecca sent an email stating that she never wanted to move Jack anywhere and demanded that Alice and Peter stop saying that she wanted to sell Jack's house and put him in an institution. Rebecca requested that Alice and Peter stop lying about her intentions. Jack became worried that he was going to run out of money.

On October 30, Peter drafted a "Peace of Mind Commitment" document to create a $500,000 fund for Jack's care in case Jack ran out of money. *Id.* at 802. On November 5, Peter sent this document to Jack's children in an email explaining that he gave this document to Jack. Peter indicated that because of the document Jack was no longer worrying about his finances. Peter further indicated that Jack kept the document at his bedside table and was now sleeping better.

That same day Janean Kelly responded to a WSBA posting for an estate planning attorney. Kelly met with Jack as a prospective client for about ninety minutes to discuss Jack's intentions regarding his estate. Jack was adamant that he be allowed to stay in his home and was upset that a member of his family wanted to sell his home and relocate him to a care facility. Jack retained Kelly and it was agreed that Kelly would prepare new estate planning documents for him. In their meeting, Jack expressed his desire to revoke his March 2021 powers of attorney and create new ones naming Alice as his attorney-in-fact to act on his behalf.

On November 7, Jack terminated Vikki and Rebecca's financial and healthcare powers of attorney. Jack notified Vikki and Rebecca that he planned to have new powers of attorney prepared that would prohibit his house from being sold and require that he reside in his home until his death unless absolutely not feasible. That same day, Jack executed a general durable power of attorney that prohibited a sale of Jack's home without his authorization. Jack appointed Alice as his financial and healthcare attorney-in-fact. Jack also executed an advanced health care directive that provided that if he was diagnosed with a terminal condition, he did not want to have artificially provided nutrition, hydration, respiration, or to be resuscitated. Moreover, Jack's durable power of attorney reiterated that Jack's strong desire was to remain in his residence. Jack also signed an amendment to the trust he signed on September 1, giving his Washington house in full to Alice and making Alice the successor trustee in the event of Jack's death.

On December 2, 2021, Jack executed a new will, which gave Jack's house entirely to Alice upon his death and thereafter distributed his remaining estate equally in thirds to Rebecca, Joe, and Alice. Jack nominated Alice and Peter as his co-personal representatives.

Between December 1 and December 5, Jack's health deteriorated. Peter sent out an "alert the relatives" email on December 1, telling Alice's siblings that Jack's condition appeared to be deteriorating and that Jack had made comments suggesting he thought his death was impending. CP at 44; *see also id.* at 804. Peter also said that Jack had periods of lucidity and told the family members "[y]ou could still have great conversations with him." *Id.* at 44. Rebecca sent an email later that night thanking Peter for the email. Alice sent multiple texts to family members explaining that Jack was in a very poor condition. Alice stated that Jack was declining, and the family should come and say " 'their final goodbyes.' " *Id.* at 805. Alice wrote that "Jack hurt his shoulder, was

5

eating very little, had not drank for two days, was making non-sensical verbalization, was feeling hot then cold, had some confusion, was taking several naps a day, was falling, and that she and Peter could no longer take him to the bathroom." *Id.*

On the evening of December 5, Alice called 911 because Jack was shivering. Jack was admitted to the hospital that evening. Jack was diagnosed with a urinary tract infection at the hospital. On the morning of Monday, December 6, Alice notified her siblings that Jack was in the hospital. On that same day, Rebecca filed a VAPO petition on behalf of Jack against Alice and Peter. The court granted the petition that morning. When Alice arrived at the hospital on the evening of December 6, security prevented her from re-entering the hospital that day because of the VAPO. The next day a sheriff's deputy arrived at Jack's home and evicted Alice and Peter with fifteen minutes' notice. As a result of the order, Alice never saw her father again before his death on December 9, 2021.

B. PROCEDURAL HISTORY

Rebecca's VAPO petition alleged that Alice and Peter were refusing medical care for Jack. The petition further alleged that Peter physically blocked EMTs from seeing Jack on December 5 and Alice did not stop him. Moreover, the petition alleged that "removing treatment from a man that is not [sic] sick is abuse and is life threatening. Jack has mild dementia and has been unduly influenced and convinced to change his will and change his POA agent." *Id.* at 2 (capitalization omitted). Moreover, Rebecca's petition alleged that in November Jack was taken to a new attorney to turn over all power of attorney authority to Alice and changed his trust to give her his house in full, also revoking his prior powers of attorney, which was contrary to years of prior estate plans.

The VAPO petition sought, inter alia, to prevent Alice and Peter from committing or threatening to commit physical harm, bodily injury, assault, molestation, harassment, or stalking Jack. It also sought to prevent Alice and Peter from committing or threatening to commit acts of abuse, exploitation, or neglect against Jack, separate Alice and Peter from Jack, prevent Peter and Alice from having contact with Jack, to bar Alice and Peter from Jack's home, to require Alice and Peter to provide an accounting, restrain Alice and Peter from transferring either Jack or Alice's property, and to immediately suspend Alice's health care power of attorney and all health care decision-making power.

On December 7, 2021, William Broughton, an attorney appearing on behalf of Jack, filed a motion to modify the court's temporary restraining order. Jack requested that the temporary restraining order be modified to allow Alice to remain in Jack's residence. Jack also requested that the court suspend the VAPO condition prohibiting contact between Alice from Jack and the condition requiring an accounting of Jack's assets until an evidentiary hearing. The superior court reissued the VAPO, extending the order until January 7, 2022.

On January 6, 2022, in a separate probate action, Alice filed a request that a professional fiduciary be appointed as personal representative for her father's estate in her place. Peter joined in this request.

On January 7, 2022, the superior court held a hearing on the VAPO petition. Rebecca requested that the court order Alice and Peter to account for any use of Jack's assets, prohibit Alice and Peter from handling Jack's estate assets, and prohibit Alice and Peter from serving as personal representatives of Jack's estate. Rebecca did not seek damages.

7

The superior court granted the petition and entered a VAPO with two restraint provisions against Peter and three against Alice.[3] As to both Peter and Alice, the VAPO restrained them from acting as personal representative in Jack's estate until a "court has formally ruled on who may serve in cause number 21-4-01252-18." *Id*. at 429, 751, 757 (capitalization omitted). The VAPO further restrained Peter and Alice from transferring Jack's property for a period of 90 days. As to Alice alone, the VAPO restrained her from "transferring respondent's property only JOINT BANK ACCOUNT w/Jack @ Kitsap Bank." *Id*. at 429. The order also provided that Alice could return to Jack's house. The orders restraining Peter and Alice contained two identical legal conclusions:

> Court finds that the Respondent committed personal exploitation by exerting undue influence. Court finds that the Respondent assumed [a] caregiver role and committed neglect by failing to provide and refusal to allow medical care.[4]

*Id*. 429, 751, 757 (capitalization omitted).[5]

The superior court held another hearing on January 31, 2022, noting that it would review the materials and enter written findings of fact at a later date.

On April 26, 2022, the superior court entered written findings of fact and conclusions of law. Based on the court's factual findings, the court concluded that Alice and Peter abused Jack by committing personal exploitation as defined by former RCW 74.34.020(2)(d) (2019).

---

[3] About a week after the issuance of the VAPO, the superior court entered a corrected VAPO against Peter with the cause number from his case. The January 7 order against Peter bore the cause number for the VAPO against Alice.

[4] The language in the order against Peter differs very slightly in that it says "refusal of medical care" rather than "refusal to allow medical care." *Compare* CP at 429, *with id*. at 751, 757. This difference is not material to our analysis.

[5] The language used in the order mirrors the statutory definitions of "personal exploitation" and "neglect." *See Compare id*. at 429, 751, 757 *with* former RCW 74.34.020(2)(d), (16) (2019). The "findings" are merely an application of legal principles to facts and, as such are legal conclusions.

Additionally, the court concluded that Alice and Peter exerted undue influence over Jack to cause him to act in a way that was inconsistent with relevant past behavior. Furthermore, the court concluded that Alice and Peter exerted undue influence by deceiving Jack and leading him to believe that Vikki and Rebecca intended to sell his house and put him into an institution. The court concluded that these false statements were used to persuade Jack to change his estate plan, will and trust documents as well as his powers of attorney. The court also concluded that Alice and Peter neglected Jack as defined in former RCW 74.34.020(16)(b).

However, the superior court also imposed additional restraint provisions in this order. The April 26 order stated in relevant part that:

> 1. The Court incorporates the provisions of the Vulnerable Adult Protection Orders issued by the Court on January 7, 2022;
> 2. Alice Clearman and Peter Buck may return to Jack's home for the time being until further determinations of the Court or unless the court-appointed professional fiduciary in the probate estate of Jack Clearman determines otherwise;
> 3. Alice Clearman and Peter Buck may not destroy, sell, remove, or donate any items that constitute Jack Clearman's personal, estate, or trust property;
> 4. Alice Clearman and Peter Buck are prohibited from accessing the funds in the Kitsap Bank account wherein approximately $46,000 was transferred from Jack Clearman prior to his death. The previously requested accounting of these funds and this newly created account should be provided to the Court and/or the court-appointed professional fiduciary in the probate estate of Jack Clearman;
> 5. Alice Clearman and Peter Buck are prohibited from recording any deeds to any real property in the name of Jack Clearman or Estate of Jack Clearman;

*Id.* at 809.

Alice and Peter appeal the VAPO, as well as the April 26 order amending the VAPO.

## DISCUSSION

### I. MOOTNESS, JURISDICTION, AND THE SUPERIOR COURT'S AUTHORITY TO ENTER THE VAPO

Alice and Peter argue that the VAPO entered on January 7 was moot at the time it was entered, and the April 26 order was moot as well. According to Alice and Peter, the superior court

was unable to provide effective relief when it entered the VAPO on January 7 because Jack had died and the VAPO court was aware that Alice and Peter had declined to serve as personal representatives of Jack's estate and access to Jack's estate and property were governed by the probate action that had already commenced. Alice and Peter additionally argue that the superior court lacked jurisdiction over the VAPO petition because Rebecca had not initiated a claim for damages, and the superior court had no authority to enter the VAPO where the personal representative of the estate had not substituted in as the petitioner in the VAPO.

Rebecca responds that the VAPO was not moot at the time it was entered because the superior court was able to provide effective relief in the form of protection of *other* vulnerable adults with whom Alice or Peter might come into contact in the future, and that the superior court retained jurisdiction over the VAPO petition even in the absence of a claim for damages because former RCW 74.34.210 (2007), repealed by LAWS OF 2021, ch. 215, § 170, did not limit the basis for continuing jurisdiction to an action for damages. Rebecca does not respond to the assertion that the superior court lacked the authority to enter the VAPO because the personal representative had not stepped in as the petitioner.

A. LEGAL PRINCIPLES

    1. *Mootness*

A case is moot when a court can no longer provide effective relief. *Global Tel\*Link Corp. v. Dep't of Corr.*, 24 Wn. App. 2d 852, 856, 521 P.3d 250 (2022). Mootness is a question of law we review de novo. *Gronquist v. Dep't of Corr.*, 196 Wn.2d 564, 568, 475 P.3d 497 (2020). In

general, a case that becomes moot should be dismissed. *State v. Cruz*, 189 Wn.2d 588, 597, 404 P.3d 70 (2017).[6]

    2. *The Abuse of Vulnerable Adults Act*

The purpose of the "Abuse of Vulnerable Adults Act", ch. 74.34 RCW, is to protect vulnerable adults who "may be subjected to abuse, neglect, financial exploitation, or abandonment by a family member." RCW 74.34.005(1); *In re Vulnerable Adult Pet. for Knight*, 178 Wn. App. 929, 937-38, 317 P.3d 1068 (2014). The superior court can issue a VAPO for the protection of a vulnerable adult. Former RCW 74.34.110 (2007); *Knight*, 178 Wn. App. at 938. We review a superior court's decision to grant or deny a VAPO for abuse of discretion. *In re Vulnerable Adult Pet. for Winter*, 12 Wn. App. 2d 815, 838, 460 P.3d 667 (2020). A trial court abuses its discretion if its " 'order is manifestly unreasonable or based on untenable grounds.' " *Gilmore v. Jefferson County Pub. Transp. Benefit Area*, 190 Wn.2d 483, 494, 415 P.3d 212 (2018) (internal quotation marks omitted) (quoting *In re Pers. Restraint of Rhome*, 172 Wn.2d 654, 668, 260 P.3d 874 (2011)). A ruling is manifestly unreasonable or based on untenable grounds if it is unsupported by the record or results from applying the incorrect legal standard. *Id.* The reviewing court must be persuaded that " 'no reasonable person would take the view adopted by the trial court' " and not merely because it would have reached a different outcome. *Id.* (emphasis omitted) (internal quotation marks omitted) (quoting *State v. Salgado-Mendoza*, 189 Wn.2d 420, 427, 403 P.3d 45 (2017)).

---

[6] An exception to this rule is when a moot case presents issues of continuing and substantial public interest. *In re Marriage of Horner*, 151 Wn.2d 884, 891, 93 P.3d 124 (2004). In this case, Rebecca does not assert this exception. Rather, she contends the case is not moot because we can continue to provide effective relief.

Former RCW 74.34.210 provided that:

A petition for an order for protection may be brought by the vulnerable adult, the vulnerable adult's guardian or legal fiduciary, the department, or any interested person as defined in RCW 74.34.020. An action for damages under this chapter may be brought by the vulnerable adult, or where necessary, by his or her family members and/or guardian or legal fiduciary. The death of the vulnerable adult shall not deprive the court of jurisdiction over a petition or claim brought under this chapter. Upon petition, after the death of the vulnerable adult, the right to initiate or maintain the action shall be transferred to the executor or administrator of the deceased, for recovery of all damages for the benefit of the deceased person's beneficiaries set forth in chapter 4.20 RCW or if there are no beneficiaries, then for recovery of all economic losses sustained by the deceased person's estate.

RCW 74.34.200 provides that:

[A] vulnerable adult who has been subjected to abandonment, abuse, financial exploitation, or neglect either while residing in a facility or in the case of a person residing at home who receives care from a home health, hospice, or home care agency, or an individual provider[7], shall have a cause of action for damages on account of his or her injuries, pain and suffering, and loss of property sustained thereby.

Statutory interpretation is a question of law reviewed de novo. *Lakeside Indus., Inc. v. Dep't of Revenue*, 1 Wn.3d 150, 155, 524 P.3d 639, 643 (2023). The goal of statutory interpretation is to carry out the legislature's intent. *Leishman v. Ogden Murphy Wallace, PLLC*, 196 Wn.2d 898, 904, 479 P.3d 688 (2021). We must give effect to the plain meaning of a statute as an expression of legislative intent where possible. *Id.* If the plain language of the statute is unambiguous, our inquiry is over. *Id.* Even so, if the statute is subject to more than one reasonable interpretation, we may resort to statutory construction, legislative history, and case law to assist in determining legislative intent. *Id.*

---

[7] Former RCW 74.34.020(11) defined individual provider as a "person under contract with the department to provide services in the home under chapter 74.09 or 74.39A."

B. ANALYSIS

As an initial matter, both parties confuse the concept of mootness with the concept of jurisdiction. "Subject matter jurisdiction simply refers to the court, in which a party files a suit or a motion, being the correct court for the type of suit or character of a motion." *In re Est. of Reugh*, 10 Wn. App. 2d 20, 48, 447 P.3d 544 (2019). "If the type of controversy is within the subject matter jurisdiction, then all other defects or errors go to something *other* than subject matter jurisdiction." *Id.* (emphasis added). Mootness, on the other hand, deals with the trial court's ability to provide effective relief, as we explain above. A case can be moot without the trial court losing "jurisdiction" over the case. With that said, we turn to the parties' arguments.

Alice and Peter contend that this case was moot when the court entered the VAPO on January 7, 2022, because Jack's physical safety was no longer at issue following his death, and Alice and Peter were unable to transfer Jack's assets as of January 6, 2022, because Alice and Peter declined to serve as personal representative of Jack's estate and requested that the probate court appoint a third-party professional.

Rebecca does not respond to Alice and Peter's argument related to their inability, as of January 6, to access or control any of Jack's assets. Rebecca's entire argument related to mootness is that dismissal of the VAPO petition on January 7 would result in "great injustice" because Peter "would have avoided accountability" for abusing Jack. Br. of Resp't at 46. Rebecca further argues that the court can provide effective relief to other, unnamed third parties who might, at some point in the future, encounter Alice and Peter because the VAPO pertaining to Jack will "prevent[ ] Alice and Peter from engaging in further abuse of other vulnerable adults." *Id.* at 47.

These arguments are meritless. First, the purpose of a VAPO is not to punish or hold the restrained party accountable. A VAPO action is not criminal in nature. Rather, the purpose of a VAPO is to protect the vulnerable adult found to be at risk. RCW 74.34.005; *Knight*, 178 Wn. App. at 937-38.[8]

Second, Rebecca cites no authority holding that the "effective relief" contemplated by the mootness doctrine can be speculative relief accruing to unknown third parties at some point in the future. "Where a party fails to cite to relevant authority, we generally presume that the party found none." *State Constr., Inc. v. City of Sammamish*, 11 Wn. App. 2d 892, 906, 457 P.3d 1194 (2020).

Third, Alice and Peter were unable to transfer Jack's assets as of January 6, 2022, because Alice and Peter declined to serve as personal representatives of Jack's estate and requested that the probate court appoint a third-party professional. The probate court would control Jack's assets in probating his estate. There was a simultaneous probate action that the superior court was aware of. As a result, Rebecca's request to prevent the transfer of Jack's assets was moot. Rebecca's request for an accounting was also moot because at oral argument before the superior court, the court learned that the Kitsap Bank account was frozen and under the supervision of the probate court.[9]

We agree with Alice and Peter that the VAPO petition was moot at the time it was entered on January 7, 2022, and the VAPO must be vacated.

---

[8] Because Jack passed away on December 9, it is undisputed that Jack's physical safety was no longer at issue.

[9] We note that only the executor or administrator, i.e. personal representative, may bring a VAPO under the plain language of former RCW 74.34.210.

ATTORNEY FEES

Alice and Peter argue that the superior court erred in awarding attorney fees to Rebecca because it erred in entering VAPO orders against Alice and Peter. We vacate the superior court's award of attorney fees to Rebecca because the January 7 and April 26 orders were moot when entered and the superior court lacked the authority to enter a VAPO when the personal representative of Jack's estate had not filed a VAPO petition. As a result, the superior court erred in awarding attorney fees to Rebecca.

Alice and Peter seek attorney fees on appeal. They argue that the court should award attorney fees to them that they incurred below and on appeal because Rebecca, Vikki, and Joe's conduct demonstrate that the VAPO action was motivated by bad faith.

RAP 18.1(a), (b) provides a party the "right to recover reasonable attorney fees or expenses on review" provided that the party requests the fees in its opening brief and "applicable law" grants the right to recover. We award attorney fees to the prevailing party " 'only on the basis of a private agreement, a statute, or a recognized ground of equity.' " *Tedford v. Guy*, 13 Wn. App. 2d 1, 17, 462 P.3d 869 (2020) (quoting *Equitable Life Leasing Corp. v. Cedarbrook*, Inc., 52 Wn. App. 497, 506, 761 P.2d 77 (1988)).

The only authority that Alice and Peter cite to support their claim for attorney fees incurred below and on appeal is *Dalton M., LLC v. North Cascade Trustee Services, Inc.*, 20 Wn. App. 2d 914, 504 P.3d 834, *review granted*, 200 Wn.2d 1016 (2022). In *Dalton,* Division Three of this court held that, Dalton, the appellant, could recover reasonable attorney fees incurred below for the bad faith conduct of a bank in failing to recognize Dalton's valid claim and failure to clear title. 20 Wn. App. 2d at 964. The court remanded to the superior court to determine a reasonable amount

incurred by Dalton as a result of this bad faith. *Id.* However, *Dalton* is distinguishable from this case because in *Dalton*, the court noted that the superior court *found* that the bank acted in bad faith. *Id.* at 961. Here, the superior court did not make a finding that Rebecca acted in bad faith in maintaining the VAPO petition after Jack's death. Consequently, we do not award attorney fees to Alice or Peter incurred below because no finding of bad faith was made by the superior court.

*Dalton* also is the only authority that Alice and Peter cite in support of their claim for attorney fees incurred on appeal. However, in *Dalton* Division Three *denied* Dalton's request for attorney fees incurred on appeal because Dalton only devoted one sentence to a request for attorney fees pursuant to RAP 18.1. *Id.* at 963-64. As a result, *Dalton* does not support Peter and Alice's claim for attorney fees incurred on appeal. Further, we presume that when a party fails to provide relevant authority for a proposition, no such authority was found. *State Constr., Inc.*, 11 Wn. App. 2d at 906. We do not award attorney fees to Alice or Peter incurred on appeal because they do not cite to any authority that *supports* their claim for attorney fees.

Rebecca argues that the court should award attorney fees and costs on appeal to her as the prevailing party under former RCW 74.34.130(7) (2007), repealed by LAWS OF 2021, ch. 215, § 170. Former RCW 74.34.130(7) allowed the court to enter relief for the protection of the vulnerable adult including:

> Requiring the respondent to pay a filing fee and court costs, including service fees, and to reimburse the petitioner for costs incurred in bringing the action, including a reasonable attorney's fee.

We decline to award attorney fees to Rebecca on appeal because she is not the prevailing party.

## CONCLUSION

We hold that the superior court erred in entering the January 7 and April 26 orders against Peter and Alice because the VAPO petition was moot. Therefore, we vacate the superior court's January 7 and April 26 orders.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
CRUSER, A.C.J.

We concur:

_____
LEE, J.

_____
VELJACIC, J.