MADSEN, J.
*487 ¶ 1 In 2008, an employee of Jefferson County Public Transportation Benefit Area (Jefferson Transit) caused a vehicle collision with Michael Gilmore. Gilmore brought a *215 personal injury suit against Jefferson Transit for injuries he allegedly sustained in that collision. At trial, the jury awarded Gilmore $1.2 million for past and future economic losses.
¶ 2 This case concerns three issues-whether the trial court abused its discretion (1) in excluding Dr. Allan Tencer's expert biomechanical testimony, (2) in barring evidence of Department of Labor and Industries (L&I) payments to Gilmore, and (3) in determining that Gilmore's counsel's closing argument did not require a new trial.
¶ 3 In an unpublished decision, the Court of Appeals reversed, holding that the trial court abused its discretion with respect to each issue. Gilmore v. Jefferson County Pub. Transp. Benefit Area, No. 48018-2-II, slip op., 2017 WL 1477830 (Wash. Ct. App. Apr. 25, 2017) (unpublished), https://www.courts.wa.gov/opini-ons/pdf/D24¨8018-2IIÜnpublishedÖpinion.pdf. We reverse the Court of Appeals.
FACTS
Background
¶ 4 Gilmore was stopped at a traffic light. Charles Cotterill, a Jefferson Transit employee, was driving a bus *488 behind Gilmore. Cotterill failed to stop his bus in time and collided with Gilmore's vehicle. Gilmore was working for Brother's Plumbing and driving a van owned by his employer at the time of the collision. While the damage to both vehicles was minimal,[1] Gilmore described the collision as "devastating." 5 Verbatim Report of Proceedings (VRP) at 773.
¶ 5 Immediately after the collision, Gilmore was taken to the emergency room. He complained of nausea and headache, as well as pain in his neck, hip, and lower back. A few days later, Gilmore returned to the emergency room, complaining of headaches and numbness in his hands. As a result, Gilmore received L&I payments for wage loss and time loss. He also received a $40,000 lump sum L&I payment for permanent partial disability. Additionally, Gilmore was already receiving disability compensation from the Department of Veterans Affairs (VA). Gilmore was given a 60 percent disability rating for, among other things, degenerative arthritis in his thoracicolumbar spine, left elbow, and both of his hips and knees.
¶ 6 In April 2008, Gilmore underwent an MRI (magnetic resonance imaging ), which revealed several disc bulges in his neck. In the following months, Jefferson Transit hired a private investigator to take video surveillance of Gilmore. The investigator documented Gilmore engaging in several physical activities. Gilmore's pain subsided until 2009 when he opened his own plumbing business and began working again. A subsequent MRI revealed that Gilmore's disc bulges worsened and required surgery. Gilmore did not get the recommended surgery at that time because he just started his own plumbing business and could not afford to take time away from work. Instead, Gilmore was prescribed *489 opioids and placed on a "high risk medication management" program. He finally underwent neck surgery in 2015.
¶ 7 In 2010, Gilmore sued Jefferson Transit in the underlying action for his injuries. Jefferson Transit admitted liability for the collision but maintained that it did not cause Gilmore's injuries.
Pretrial
¶ 8 The trial court ruled on several motions in limine before trial. The court granted Jefferson Transit's motion to exclude "golden rule arguments," which are arguments encouraging jurors to put themselves in Gilmore's place when deciding the case. Additionally, after reconsideration, the trial court granted Gilmore's motion to exclude evidence of his L&I and VA payments.
¶ 9 The trial court also granted Gilmore's motion to exclude Dr. Tencer's testimony. Dr. Tencer is a mechanical engineer and former professor who has done "research in the field of biomechanics related to injury prevention." Clerk's Papers (CP) at 365. He holds a bachelor's degree, a master's degree, and a PhD in mechanical engineering. Dr. Tencer is a well-known expert in Washington, *216 having contributed biomechanical testimony in many personal injury cases. Dr. Tencer does not offer any medical opinion, but rather is primarily concerned with the severity of the impact in a given collision. His intended testimony here relates to a "quantitative description of the forces experienced by the Plaintiff in the crash and a comparison of those forces to forces of common experience." Id. at 366. In order to calculate a collision's impact, Dr. Tencer relies on several factors, including the "weights of the vehicles based on information provided by the automobile industry, the speed of the striking vehicle based on its level of damage, and the coefficient of restitution[,] which describes the elasticity of the impact and braking forces, to compute the speed change and acceleration of the struck vehicle." Id.
¶ 10 Before granting Gilmore's motion to exclude Dr. Tencer's testimony, the trial court engaged in a lengthy discussion *490 with counsel. Gilmore's counsel argued that "Dr. Tencer's opinion [is] based on rank speculation and conjecture." 1 VRP at 35. He argued that Dr. Tencer's testimony would be irrelevant since he would not be offering any information that the "jury can't figure out on their own." Id. at 37. Gilmore's counsel suggested that there was enough other evidence for the jury to determine the severity of the impact between the vehicles, including photographs of the collision and testimony from Gilmore, a passenger on the bus, and potentially the bus driver. Gilmore's counsel argued that Dr. Tencer's testimony is unreliable and would lend scientific authority that is overly prejudicial.
¶ 11 In response, Jefferson Transit's counsel argued that the admissibility of Dr. Tencer's testimony should be based on whether the court thinks it will be helpful to the jury. In granting Gilmore's motion, the trial court explained:
As far as what I can tell from what I read, and the way I understand it, um, he makes a number of assumptions, some of which are based on facts that are not going to be in evidence. And it does-and he does create, um-he does-he does-well, it's-to me, it's intended to create an inference, um, of-well, I don't know, it's create-it's intended to create an inference with some aura of authority that I don't think is reasonable or justified. And I think that-I think it will be confusing to the jury. I think that it will be misleading to the jury.
And, um, so I'm going to grant the motion to exclude Dr. Tencer, based on-based on what I-what I read.
Id. at 39.
Trial
¶ 12 At trial, Gilmore's sons, Alex and Matthew Gilmore, each testified to Gilmore's physical and mental condition after the collision. Alex Gilmore testified:
Um, well, it was-it was such a long time ago, but I do my best here, uh. He, well, wasn't able to work as soon as the collision happened. He had to stop working, uh. And he, pretty much, *491 at-things, kind of, hit the fan when, uh, he wasn't able to work. And, uh, it was hard to pay the bills.
He-he and my mom didn't exactly get along very well for-for much longer after [the collision] happened. Uh, lots of financial issues causing them to argue. And my dad and I, at one point, ended up, uh, moving out into a travel trailer, uh, with some friends and-because of the arguments between them-between my parents.
4 VRP at 508. And Matthew Gilmore testified:
Um, after the collision he started drinking. Uh, he, I guess, didn't feel like he was able to provide for his family the way he should and wasn't able to work. You know, he-he was working 80 hours a week prior to the accident. Uh, sat records with Brother's Plumbing for, uh, installs on water heaters and all sorts of stuff.
Um, and to go from that to nothing he didn't know what to do. He went way downhill, uh, you know. You could see the sadness in his eyes. You could see the pain. Um, and he started drinking and eventually became addicted to it. I-I guess he was addicted to it years and years and years ago. Uh, well before I was ever born, he quit and, uh, picked it back up. And that's *217 when our relationship started going way downhill.
Id. at 532. After Matthew Gilmore's direct examination, Jefferson Transit argued that Alex and Matthew Gilmore's testimony opened the door to collateral source payments since it violated the motion in limine prohibiting any "mention of Plaintiff's financial status," and Jefferson Transit moved to allow evidence of Gilmore's L&I payments. Id. at 536. The trial court denied this request, but also explained:
[I]f there's a case out there that suggests to me that she's opened the door and this L&I stuff can come in, then it'll probably come in. But as of right now, I haven't seen that case or anything so I'm not going to go down that road.
Id. at 543.
*492 Closing Argument
¶ 13 During closing arguments, Gilmore's counsel made some questionable statements to the jury. She said:
So what do we do? Do we let the government win?
....
Mike can't fight the government alone. He can't.
....
Can't fight the government. We certainly can't fight the government in this case without you. Because it's you who are going to determine the amount that's going to fairly and reasonably compensate Mike for these injuries.
7 VRP at 989, 991, 996. She added:
I'm going to tell you something, that there has been a fraud perpetuated in this courtroom during this trial. There has been. There has been someone in this trial who has continually tried to mislead you, who has continually thrown evidence at you to try to take you off what's really at issue in this case. And that's the Defense.
....
I'm going to talk to you about some of the ... frauds that the Defense has tried to perpetuate.
Id. at 978-79. And again on rebuttal, she said:
But that's what the government does. Why do they do that? They do that because no one holds them accountable. They do that because they can. They do that because nobody stands up and fights.
....
... And you know that if you don't hold the government accountable, that they will just keep doing what they're doing. That they will feel like they can run into anybody in this community and just walk away.
Id. at 1031-32. Jefferson Transit's counsel did not object to Gilmore's counsel's closing argument or her rebuttal. Instead, he told the jury:
*493 You know, it looks like a lot of theater. And you know what, you're right. A lot of this is theater. It's putting on a show. The attorneys are trying to persuade this jury. That's the whole point. And the reason jury trials work so well is because you've got somebody trying to persuade the jury this way, but somebody else trying to persuade the jury that way. And somehow the two kind of, you know, boil to the surface.
....
One of the-one of the techniques that lawyers use to persuade the jury is to, uh, try to turn the tables and-and demonize the other side.
....
Um, and then you demonize the other side by saying, well, it's the government. You can't fight the government. Look how bad they are. You know, look how nasty they are. They keep pointing to all this evidence and all these facts which are, uh, outrageous to us. You know, we don't like them. They don't like them because they reveal the truth of what's going on. But that's how-that's how you present your case.
Id. at 1007-08.
Verdict and Procedural History
¶ 14 The jury found in Gilmore's favor, and awarded him $1.2 million for past and future *218 noneconomic damages. Jefferson Transit subsequently moved for a new trial and remittitur. The trial court denied the motion because it did "not find, in the context of the entire record, that there was any event, misconduct, or discovery violation sufficient to justify a new trial or a remittitur." CP at 724.
¶ 15 Jefferson Transit appealed, and the Court of Appeals reversed in an unpublished decision. Gilmore, No. 48018-2-II, slip op. at 1. The Court of Appeals held that the trial court committed reversible error by excluding Dr. Tencer's expert testimony. Id. Additionally, it chose to address the admissibility of Gilmore's L&I payments and whether Gilmore's counsel's closing argument constituted misconduct. Id. at 19, 21.
*494 ¶ 16 Gilmore sought review of the Court of Appeals decision.
ANALYSIS
Standard of Review
¶ 17 We review a trial court's evidentiary rulings for an abuse of discretion. State v . Ellis, 136 Wash.2d 498, 504, 963 P.2d 843 (1998). " 'A court abuses its discretion when an "order is manifestly unreasonable or based on untenable grounds." ' " In re Pers. Restraint of Rhome, 172 Wash.2d 654, 668, 260 P.3d 874 (2011) (quoting State v. Rafay, 167 Wash.2d 644, 655, 222 P.3d 86 (2009) (quoting Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp., 122 Wash.2d 299, 339, 858 P.2d 1054 (1993) ) ). Rulings that are manifestly unreasonable or based on untenable grounds include those that are unsupported by the record or result from applying the wrong legal standard. State v. Salgado-Mendoza, 189 Wash.2d 420, 427, 403 P.3d 45 (2017). Furthermore, "[a] reviewing court may not find abuse of discretion simply because it would have decided the case differently-it must be convinced that ' "no reasonable person would take the view adopted by the trial court." ' " Id. (quoting State v. Perez-Cervantes, 141 Wash.2d 468, 475, 6 P.3d 1160 (2000) (quoting State v. Huelett, 92 Wash.2d 967, 969, 603 P.2d 1258 (1979) ) ).
¶ 18 We also review the admissibility of expert testimony under this standard. Johnston-Forbes v. Matsunaga, 181 Wash.2d 346, 352, 333 P.3d 388 (2014) (citing In re Marriage of Katare, 175 Wash.2d 23, 38, 283 P.3d 546 (2012) ). In this context, "[i]f the basis for admission of the evidence is ' "fairly debatable," ' we will not disturb the trial court's ruling." Id. (internal quotation marks omitted) (quoting Grp. Health Coop. of Puget Sound, Inc. v. Dep't of Revenue, 106 Wash.2d 391, 398, 722 P.2d 787 (1986) ).
¶ 19 A trial court's decision to grant or deny a motion for a new trial is reviewed for an abuse of discretion.
*495 Alum. Co. of Am. v. Aetna Cas. & Sur. Co., 140 Wash.2d 517, 537, 998 P.2d 856 (2000). The pertinent inquiry is whether " 'such a feeling of prejudice [has] been engendered or located in the minds of the jury as to prevent a litigant from having a fair trial.' " Id. (internal quotation marks omitted) (quoting Moorev. Smith, 89 Wash.2d 932, 942, 578 P.2d 26 (1978) ).
Excluding Dr. Tencer's Testimony
¶ 20 The central issue in this case is whether the trial court abused its discretion in excluding Dr. Tencer's expert testimony. In Washington, trial courts generally look to three elements in determining the admissibility of expert testimony-whether
(1) the expert is qualified, (2) the expert relies on generally accepted theories in the scientific community, and (3) the testimony would be helpful to the trier of fact.
Johnston-Forbes, 181 Wash.2d at 352, 333 P.3d 388 ; see ER 702 (a qualified expert may testify if the expert's "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue").
¶ 21 Dr. Tencer is often called to testify as an expert in Washington personal injury cases. Because the accuracy of using biomechanics to assess impact severity is controversial, courts disagree as to whether and under what circumstances to admit Dr. Tencer's expert testimony. For example, in Johnston-Forbes, the plaintiff in a personal injury suit appealed a trial court ruling denying her motion in limine to exclude Dr. Tencer's testimony. 181 Wash.2d at 351, 333 P.3d 388. In affirming, we held that trial courts *219 have wide discretion in determining the admissibility of biomechanical testimony, and that a trial court does not abuse that discretion if it follows "the analytical framework required under the ERs." Id. at 354, 333 P.3d 388. Understanding that the admissibility of such testimony could vary from case to case, we added that it is "not remarkable that trial judges have sometimes allowed biomechanical engineering testimony, *496 and specifically Tencer's testimony, where sometimes trial judges have excluded it." Id. at 353-54, 333 P.3d 388 (" '[t]he broad standard of abuse of discretion means that courts can reasonably reach different conclusions about whether, and to what extent, an expert's testimony will be helpful to the jury in a particular case' " (quoting Stedman v. Cooper, 172 Wash.App. 9, 18, 292 P.3d 764 (2012) ) ).
¶ 22 In Stedman, the trial court excluded Dr. Tencer's expert testimony, finding that it may be more "misleading than helpful." 172 Wash.App. at 20-21, 292 P.3d 764. The Court of Appeals in that case affirmed the trial court, holding that it did not abuse its discretion. Id. at 21, 292 P.3d 764 ; see Johnston-Forbes, 181 Wash.2d at 358, 333 P.3d 388 (Yu, J., concurring) ("Moreover, our decision in this case does not overrule Stedman .").
¶ 23 Here, Jefferson Transit complains that the trial court abused its discretion because it failed to consider the ER 702 factors. It argues the trial court did not discuss the scientific credibility of Dr. Tencer's testimony and did not address the analytical framework set forth in case law for excluding experts or, indeed, any of the elements of ER 702 in excluding Dr. Tencer's testimony. However, reading the trial court's ruling in conjunction with Gilmore's arguments, it is apparent that the trial court had these concerns in mind.
¶ 24 Specifically, Gilmore argued that
[Dr. Tencer ] adds this sort of scientific authority.
It's simply not reliable, and it is overly prejudicial in that it gives an air of superiority to testimony that's ... based on simply Dr. Tencer guessing as to the factors that would be involved.
1 VRP at 38 (emphasis added).
¶ 25 The trial court apparently agreed with Gilmore when it concluded that Dr. Tencer's testimony "intended to create an inference with some aura of authority that I don't think is reasonable or justified." Id. at 39. Indeed, Dr. Tencer's research is not without controversy. And, while the *497 trial court did not mention ER 702, it also addressed the third element in the ER framework-whether the expert's testimony would be helpful to the trier of fact and explained the testimony would be confusing and misleading to the jury.[2]
¶ 26 Jefferson Transit also argues that by excluding Dr. Tencer's testimony, it could not present its theory of the case-that the accident was minor and was not the cause of Gilmore's injuries. We disagree. Jefferson Transit stated that causation was a disputed issue and that its "theory of the case was that Mr. Gilmore's condition was preexisting, and that he was not injured in the impact." Suppl. Br. of Resp't at 12. Dr. Tencer's testimony does not include a medical opinion, likelihood of injuries sustained, or causation assessment. Rather, his testimony deals with his estimated severity of impact. Jefferson Transit had photographic and testimonial evidence to argue the speed of the vehicle and severity of impact.
¶ 27 Jefferson Transit further argues that the trial court abused its discretion by relying on the wrong legal standard. The Court of Appeals agreed the trial court excluded Dr. Tencer's testimony because he "made 'a *220 number of assumptions, some ... based on facts that [were] not going to be in evidence,' " which is not only the wrong legal standard, but rather, an acceptable form of expert testimony. Gilmore, No. 48018-2-II, slip op. at 17 (second alteration in original) (quoting 1 VRP at 39). *498 ¶ 28 It is true that an expert may rely on facts not in evidence to formulate an opinion. ER 703. It is also true that the trial court noted that Dr. Tencer relies on facts not in evidence before it decided to grant the motion to exclude his testimony. However, as discussed, the trial court also excluded Dr. Tencer's testimony because it would create unreasonable inferences, and confuse and mislead the jury. Assuming the trial court incorrectly believed that Dr. Tencer could not base his testimony on facts not in evidence, the trial court also stated other reasons for its ruling. "A trial court's ruling on the admissibility of evidence will not be disturbed on appeal if it is sustainable on alternative grounds." Thomas v. French, 99 Wash.2d 95, 104, 659 P.2d 1097 (1983). Here, the trial court found Dr. Tencer's expert testimony to be unreliable, misleading, and confusing.
¶ 29 We find no abuse of discretion.
Excluding L&I Payments
¶ 30 The admissibility of collateral source income, such as L&I payments, is governed by both the statutory and common law collateral source rules.
¶ 31 RCW 51.24.100[3] provides:
The fact that the injured worker or beneficiary is entitled to compensation under this title shall not be pleaded or admissible in evidence in any third party action under this chapter.
See Entila v. Cook, 187 Wash.2d 480, 489, 386 P.3d 1099 (2017) ("[ RCW 51.24.100 ] is unambiguous that an employee's receipt of benefits is inadmissible in a third party action"). The common law collateral source rule is consistent with RCW 51.24.100, in that we have generally held that evidence of collateral source income should be strictly *499 excluded. See Cox v. Spangler, 141 Wash.2d 431, 439, 5 P.3d 1265, 22 P.3d 791 (2000), ("[C]ourts generally exclude evidence that the plaintiff has received compensation from a third party for an injury for which the defendant has liability. The 'rule is designed to prevent the wrongdoer from benefitting from third-party payments.' " (quoting Cox v. Lewiston Grain Growers, Inc., 86 Wash.App. 357, 375, 936 P.2d 1191 (1997) ) ); see also Johnson v. Weyerhaeuser Co., 134 Wash.2d 795, 798, 953 P.2d 800 (1998) ("In the context of personal injury actions, the collateral source rule has been the rule in Washington for 85 years." (citing Boeke v. Int'l Paint Co., 27 Wash.App. 611, 618, 620 P.2d 103 (1980) ("We agree that the rule of strict exclusion represents the better view.") ) ).
¶ 32 While Jefferson Transit agrees with the general rule that evidence of collateral source income is excluded, it argues that such evidence should have been admissible here because Gilmore "opened the door." Jefferson Transit's argument relies on our decision in Johnson, 134 Wash.2d at 804, 953 P.2d 800, where we held that a plaintiff may "waive the protections of the collateral source rule by opening the door to evidence of collateral benefits." However, we also held that the trier of fact is free to determine whether the door has been opened. Id. We will not reverse the trial court's decision unless it abused its discretion. Johnston-Forbes, 181 Wash.2d at 352, 333 P.3d 388. A trial court abuses its discretion in making evidentiary rulings if those rulings are unsupported by the record or result from applying the wrong legal standard. Salgado-Mendoza, 189 Wash.2d at 427, 403 P.3d 45.
¶ 33 Jefferson Transit's first contention is that the trial court, in barring evidence of collateral source income, applied the incorrect legal standard because it ruled that an injured party "could never open the door *221 to 'this L&I stuff.' " Suppl. Br. of Resp't at 7 (quoting 4 VRP at 543-44). We disagree. *500 ¶ 34 The trial court stated:
[F]or now, I'm going to ... deny the request [to introduce collateral source evidence].
....
... absent some case and authority on opening the door on the collateral source rule. ... [I]f there's a case out there that suggests to me that she's opened the door and this L&I stuff can come in, then it'll probably come in. But as of right now, I haven't seen that case or anything so I'm not going to go down that road.
4 VRP at 543. In context, it is apparent that the trial court believed that there was insufficient basis to conclude that the door had been opened in this instance. Notably, Jefferson Transit was given the opportunity to provide some authority that suggested Gilmore opened the door to collateral source evidence and did not do so until after the jury reached its verdict.
¶ 35 Jefferson Transit also argues that in situations similar, where the injured party introduces evidence of financial hardship in violation of the collateral source rule and his own motion in limine, the court should allow the noninjured party to rebut that evidence to preserve fairness.
¶ 36 In State v. Gefeller, we held that "[i]t would be a curious rule of evidence which allowed one party to bring up a subject, drop it at a point where it might appear advantageous to him, and then bar the other party from all further inquiries about it." 76 Wash.2d 449, 455, 458 P.2d 17 (1969). However, in Cox , we held that even if collateral source evidence is relevant, in order to be admissible, such relevance must not be outweighed by the unfair influence this evidence would likely have had on the jury. 141 Wash.2d at 441, 5 P.3d 1265, 22 P.3d 791.
¶ 37 Here, Gilmore's sons testified that these financial struggles adversely affected his mental health and personal life:
He, well, wasn't able to work as soon as the collision happened. He had to stop working .... And he, pretty much, ... kind of, *501 hit the fan when ... he wasn't able to work. And ... it was hard to pay the bills.
... [H]e and my mom didn't exactly get along very well ... for much longer after [the collision] happened. ... [L]ots of financial issues causing them to argue.
....
... [A]fter the collision he started drinking. ... [H]e, I guess, didn't feel like he was able to provide for his family the way he should and wasn't able to work. You know, he ... was working 80 hours a week prior to the accident.
... [T]o go from that to nothing he didn't know what to do.
4 VRP at 508, 532. Jefferson Transit argues that it "sought to introduce evidence of Mr. Gilmore's L&I payments only to refute his testimony of his allegedly dire financial situation," and that "exclusion of that evidence significantly harmed Jefferson Transit's defense." Answer to Pet. for Review at 14. Admissibility of evidence is reviewed for abuse of discretion. Salgado-Mendoza, 189 Wash.2d at 427, 403 P.3d 45.
¶ 38 Whether the court abused its discretion will depend on the facts of each case. For example, in Cox, we found that evidence of collateral source income had "some marginal relevance regarding the apportionment of [the plaintiff s] damages, to show malingering, or to attack her experts' credibility," but were outweighed by the prejudicial effect on the jury. Cox, 141 Wash.2d at 441, 5 P.3d 1265, 22 P.3d 791. Similarly, here, it is certainly possible for a person receiving L&I benefits to suffer financial struggle and stress. Moreover, introducing evidence of Gilmore's L&I payments does not necessarily rebut his sons' testimonies. The feelings associated with losing the ability to work and meaningfully provide for one's family are arguably not negated by L&I payments. And evidence of L&I payments arguably do not supplant the sense of purpose one may get from having a job and responsibilities. Instead, such evidence may influence the jury into incorrectly believing that Gilmore endured no pain or suffering because he had some other sources of money.
*222 *502 ¶ 39 Accordingly, we hold that the trial court did not abuse its discretion in barring Jefferson Transit from introducing evidence of Gilmore's L&I payments.
Attorney Misconduct
¶ 40 During closing arguments, Gilmore's counsel painted the government in a negative light and asked the jury to hold it responsible for the injuries sustained by Gilmore. Counsel also made several claims accusing Jefferson Transit of perpetrating a fraud in this case.
¶ 41 A trial court's decision to grant or deny a motion for new trial is reviewed for an abuse of discretion. Alum. Co. of Am., 140 Wash.2d at 537, 998 P.2d 856. We will not disturb the trial court's decision unless " 'such a feeling of prejudice [has] been engendered or located in the minds of the jury as to prevent a litigant from having a fair trial.' " Id. (quoting Moore, 89 Wash.2d at 942, 578 P.2d 26 ). The pertinent inquiry is whether Gilmore's counsel's statements prejudiced the jury to the extent that Jefferson Transit did not have a fair trial.
¶ 42 Here, in her closing argument, Gilmore's counsel said:
Mike can't fight the government alone. He can't.
....
... We certainly can't fight the government in this case without you. Because it's you who are going to determine the amount that's going to fairly and reasonably compensate Mike for these injuries.
... [N]o one holds them accountable.
... And you know that if you don't hold the government accountable, that they will just keep doing what they're doing. That they will feel like they can run into anybody in this community and just walk away.
7 VRP at 991, 996, 1031-32. Gilmore's counsel also added:
I'm going to tell you something, that there has been a fraud perpetuated in this courtroom during this trial. There has been.
*503 There has been someone in this trial who has continually tried to mislead you, who has continually thrown evidence at you to try to take you off what's really at issue in this case. And that's the Defense.
....
... I'm going to talk to you about some of the ... frauds that the Defense has tried to perpetuate.
Id. at 978-79. Jefferson Transit's counsel did not object. Instead, he told the jury that this "looks like a lot of theater," and "one of the techniques that lawyers use to persuade the jury is to ... demonize the other side." Id. at 1007. He concluded by saying, "[T]hen you demonize the other side by saying, well, it's the government. You can't fight the government. ... But that's how ... you present your case." Id. at 1008.
¶ 43 In denying Jefferson Transit's motion for a new trial, the trial court explained that "[t]his was a hard-fought case characterized by aggressive advocacy, but the Court does not find, in the context of the entire record, that there was any event, misconduct, or discovery violation sufficient to justify a new trial or a remittitur." CP at 724.
¶ 44 Unless some prejudicial effect is clear from the record, we must defer to the trial court. See Clark v. Teng, 195 Wash.App. 482, 492, 380 P.3d 73 (2016) (holding that "the trial court is 'in the best position' to gauge the prejudicial impact of counsels' conduct on the jury. Particularly when the grounds for a new trial involve the assessment of misconduct during the trial and its potential effect on the jury" (footnote omitted) ).
¶ 45 Nothing in the record suggests that Gilmore's counsel's closing argument was incurably prejudicial.[4] We *504 have held that "the *223 lack of a clear and prompt objection is strong evidence that counsel perceived no error." In re Det. of Black, 187 Wash.2d 148, 154, 385 P.3d 765 (2016), review granted, 189 Wash.2d 1015, 404 P.3d 480 (2017). In other words, this rule is meant to prevent parties from wait[ing] and gambl[ing] on a favorable verdict' before claiming error." Teter v. Deck, 174 Wash.2d 207, 225, 274 P.3d 336 (2012) (quoting Nelson v. Martinson, 52 Wash.2d 684, 689, 328 P.2d 703 (1958) ). Here, after closing arguments but before the jury delivered the verdict, the trial judge gave Jefferson Transit a final opportunity to object. The trial judge asked, "[I]s there anything we need to put on the record or do? ... [A]nything else?" VRP at 1036-37. Jefferson Transit's counsel responded "[n]o" both times. Id. at 1037.
¶ 46 By rationalizing Gilmore's counsel's statements as a "technique" and failing to object after being given several opportunities, it is clear that Jefferson Transit's counsel perceived no error and was "gambling on the verdict."
¶ 47 We hold that the trial court did not abuse its discretion in denying Jefferson Transit a new trial on the basis of counsel's remarks.
CONCLUSION
¶ 48 We reverse the Court of Appeals and hold that the trial court did not abuse its discretion in its evidentiary rulings or in its denial of a motion for a new trial.
WE CONCUR:
Fairhurst, C.J.
Johnson, J.
Owens, J.
Stephens, J.
Wiggins, J.
González, J.
Gordon McCloud, J.

The cost to replace the bike rack on the front of Jefferson Transit's bus was $1,200, and Gilmore's employer never brought a claim against Jefferson Transit for any damage done to its van.

The Court of Appeals disagreed with the trial court's ruling:
Tencer's testimony, however, was neither cumulative nor speculative. Because a disputed issue existed as to the cause and nature and extent of Gilmore's injury, Tencer's testimony would have allowed the jurors to make a more informed decision, especially given the contradictory evidence that the collision was not significant enough to cause injury. His testimony would have been subject to cross-examination and the weight of his testimony would have been determined by the jury.
Gilmore, No. 48018-2-II, slip op. at 17-18. But the appellate court may not substitute its judgment for that of the trial court. See Salgado-Mendoza, 189 Wash.2d at 427, 403 P.3d 45 ("A reviewing court may not find abuse of discretion simply because it would have decided the case differently.").

Jefferson Transit urges this court to hold that RCW 51.24.100 does not apply in situations where a plaintiff is requesting only general damages. We decline to do so. Neither our precedents nor the statute's plain text requires us to limit RCW 51.24.100's application to situations where the plaintiff requests special damages.

The Court of Appeals also held that despite Jefferson Transit's failure to "object to these remarks, the issue can still be raised on appeal because the lawyer's misconduct was so flagrant and ill-intentioned that no curative instruction could have obviated the prejudice engendered by the misconduct." Gilmore, No. 48018-2-II, slip op. at 24. We disagree and decline to reach what appears to be Jefferson Transit's independent argument based on attorney misconduct since these remarks were raised in Jefferson Transit's motion for a new trial, and we find the trial court did not abuse its discretion in denying a new trial.