# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION I

| | |
|---|---|
| In the Matter of the Estate of: | No. 86535-8-I |
| QUACH LIVING TRUST, | |
| MARY PELENTAY, Individually and as Trustee of the Quach Living Trust, U/T/I August 27, 2021, | |
| Respondent, | ORDER GRANTING MOTION FOR RECONSIDERATION AND CORRECTING OPINION |
| v. | |
| BRYAN PEREZ, individually, and LINDA QUACH, and any community assets pursuant to the Committed Intimate Relationship, | |
| Appellants. | |

Respondent, Mary Pelentay, filed a motion for reconsideration of this court's unpublished opinion filed on June 30, 2025. After consideration, it is hereby

**ORDERED** that the motion for reconsideration is granted and the opinion is corrected as follows:

On page 5 of the opinion, the sentence that states: "Pelentay died several days later, on December 19, without executing any new TODD." is corrected to read: "Betty died several days later, on December 19, without executing any new TODD."

No. 86535-8-I

FOR THE COURT: Jj. Chung, Hazelrigg, Lee

_____
Lee, J.

We concur:

_____
Chung, J.

_____
Hazelrigg, J.

2

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Estate of:

QUACH LIVING TRUST,

MARY PELENTAY, Individually and as Trustee of the Quach Living Trust, U/T/I August 27, 2021,

                Respondent,

                v.

BRYAN PEREZ, individually, and LINDA QUACH, and any community assets pursuant to any Committed Intimate Relationship,

                Appellants.

No. 86535-8-I

DIVISION ONE

UNPUBLISHED OPINION

LEE, J.[1] — This case was brought by Mary Pelentay, the Trustee of the Quach Living Trust, against Bryan Perez and Linda Quach for the recovery of real property, which Pelentay alleged belonged to the Trust. Thi Ut "Betty" Quach[2] was diagnosed with terminal cancer, and in her final months she made several different plans for the disposition of her assets, including six different deeds purportedly conveying her home to three different parties, which included Perez and the Trust. After Betty died, Perez and his partner, Linda (Betty's sister), moved into the property, claiming that Perez was the lawful owner by deed.

---

[1] Judge Lee is serving in Division One of this court pursuant to RCW 2.06.040.

[2] To distinguish the Quach sisters, they will be referred to as Betty and Linda. No disrespect is intended.

Pelentay brought this action on behalf of the Trust to quiet title and eject Perez and Linda. The superior court granted Pelentay's motion for partial summary judgment, ordering quiet title in the Trust and ejectment of Perez and Linda. Perez and Linda appeal, asserting, among other alleged errors, that the superior court improperly considered evidence barred by the parol evidence rule and dead man's statute, and that there were genuine issues of material fact precluding summary judgment. Because we find that the superior court did not abuse its discretion in considering evidence at summary judgment, and because there was no genuine issue of material fact as to Betty's lack of intent to deliver the deeds to Perez, we affirm.

FACTS

Betty died on December 19, 2021. She had been diagnosed with cancer earlier in 2021. Pelentay, Betty's longtime friend, helped Betty get her affairs in order. Pelentay assisted Betty in hiring a trust and estate attorney, Nicholas Alexander, who began working with Betty in late July or early August 2021. Alexander described "a sense of urgency" surrounding Betty's end of life planning, further complicated by Betty's indecision and her seeming attempts to accommodate her family's wishes. Clerk's Papers (CP) at 1201. Betty owned a house located in Des Moines, WA (the property), which is the subject of the dispute in this appeal.

On July 24, 2021, Betty signed a statutory warranty deed purporting to convey the property to Perez. This warranty deed conveyed the property "for and in consideration of FIFTY THOUSAND DOLLARS AND OTHER GOOD AND

2

VALUABLE CONSIDERATION in hand paid." CP at 1423. That same day, Betty signed a quitclaim deed, conveying the property to Perez "for and in consideration of: fifty thousand dollars and love and affection." CP at 1425.

On August 2, Betty e-mailed Perez, informing him that, effective August 3, he was to be designated the "sole gift recipient" for the property. CP at 984. However, this was contingent on an agreement that (1) Perez, through Linda, would pay $50,000, and (2) Jason Bangs, Betty's longtime romantic partner, would remain a tenant of the property for six months or receive a cash payout of $17,400 if Bangs decided to not remain a tenant on the property. Betty then detailed the payments already made and payments still outstanding under the agreement.

On August 3, Betty executed a transfer on death deed (TODD), naming Perez as the sole beneficiary. On August 11, Betty wrote her first of what would end up being several letters of last wishes. In it, Betty stated that her property "has been gifted to Bryan Perez," per her "transaction and agreement between him and I, confirmed August 2nd, 2021 via phone." CP at 1091. But Betty told Pelentay in an e-mail on August 11, that the letter was "not yet final" and that she would "make edits." CP at 1083. Betty wrote second and third versions of the letter on August 16 and August 20.

Throughout early- and mid-August, Perez and Linda continued to make payments to Betty for the property. On August 16, Betty text messaged Pelentay, "Linda is getting my house for $50k." CP at 1095. By August 17, Perez and Linda had paid Betty $27,600. August 21, Betty signed another statutory warranty deed, conveying the property to Perez for "TEN DOLLARS AND OTHER GOOD AND

3

VALUABLE CONSIDERATION." CP at 1427.  Although Betty signed the warranty deed on August 21 and the document contained language stating a "Document Effective Date" of August 21, the document was notarized on August 16.  CP at 1427.  Also on August 21, Betty and Perez e-mailed each other about the agreement, with Perez writing, "[T]o get more clarity this is the last and final documents needed to seal the agreements with no misinterpretations."  CP at 1432.  In a 4:21 AM e-mail on August 22, Betty told Perez:

> I actually have been quite stressed by this [] transaction and the affect it has had on Linda and my relationship, there is [a] ton of tension and she is very bothered and said we regret[] making the offer.  This really hurts me to the core.  I can[']t go anyplace knowing I caused this.  I have been able to recover most [of the] funds issued in cash by Linda and can pay her back if you want to opt out.  I can find another alternative or just move[] forward as planned and shouldn't ever have desired to do something for myself.
>
> Anyways, we can chat more but hopefully this helps you with a final decision.  Like I said I can pay most of what has already been cash paid to me back to Linda and pretend this never happened.

CP at 1432.  The e-mails between Betty and Perez also included an unsigned rental agreement for Bangs and a spreadsheet detailing that the total amount owed on the house was $95,000 more than they had earlier discussed.  Eight hours after Betty's 4:21 AM e-mail on August 22 to Perez, Betty text messaged Pelentay and told her, "Ok all done and decision is to sell home upon death and split proceeds amongst family out right."  CP at 1098.

Documents executed by Betty on August 27 demonstrate Betty's decision to sell the property.  Betty established the Quach Living Trust and named Pelentay as her successor trustee.  She executed a bill of transfer and notice of assignment

4

transferring the property to the Quach Living Trust. She signed a TODD, conveying the property to Pelentay and revoking "all prior dispositions of every kind previously made" with respect to the property. CP at 1131. And lastly, Betty wrote a new letter of last wishes which removed the earlier provision regarding the gifting of the property to Perez; instead, the new letter referenced the TODD to Pelentay, directing Pelentay to sell the property and divide the proceeds "equally amongst immediate family members." CP at 1144 (boldface omitted).

On September 2, Betty had her bank issue a cashier's check to Linda for $27,600. Linda endorsed the cashier's check and the money cleared out of Betty's bank account.

Betty wrote her final letter of last wishes on November 16. In that final letter, Betty stated that the property was subject to a TODD to Pelentay, and directed that the property be sold with equal thirds of the proceeds going to Bangs; Pelentay; and the final third to cover any outstanding debt with the remainder to go to St. Jude, Seattle Children's Hospital, and The Goodtimes Project.

Betty's uncertainty about the final disposition of the property continued to her final days. On December 14, she text messaged Pelentay, telling Pelentay that she wanted to update the TODD to leave the property to Bangs. Pelentay told Betty that she would need to speak with Alexander regarding the proposed change, and Betty told her, "It's what I want." CP at 1159. Pelentay died several days later, on December 19, without executing any new TODD.

In January 2022, Bangs moved out of the property; Bangs never received any payment from Perez. Also in January, Pelentay had significant work done to

the property after Jennie Quach, Betty's other sister and a licensed realtor, effectively told Pelentay that the property "would not sell" without the work. CP at 1562. Pelentay was later sued for payment of the work performed on the property and had to pay the contractor $80,267.01.

In February 2022, Pelentay received $1,140,000 in insurance policy proceeds from Betty's death. Pelentay distributed the insurance proceeds "as directed in Betty's November 16, 2021 Letter of Last Wishes." CP at 1065.

In April 2022, Perez sent Pelentay a "letter formally informing [Pelentay] to stop further actions," telling Pelentay that he was the legal owner of the property, that "YOU HAVE NO LEGAL RIGHTS TO THE FORESAID PROPERTY," and "[i]f you fail to stop unlawful actions, you will be subject to all appropriated civil actions. If you want a WAR get your combat bo[o]ts on. I have had mine on for 34 years. Battle ground will be the King County Court house." CP at 887, 889. Perez and Linda moved into the property in May 2022, and Perez subsequently paid off the $353,000 mortgage balance on the property.

On May 25, 2023, Pelentay, acting individually and as trustee, filed a TEDRA petition against Perez and Linda, asserting causes of action for quiet title and lis pendens, constructive trust, ejectment, trespass, unjust enrichment, and attorney fees. Pelentay sought the court's permission to sell the property, reimburse herself for costs incurred, and then distribute the proceeds "pursuant to Betty Quach's November 19 [sic], 2021 Letter of Last Wishes." CP at 19.

On February 2, 2024, Pelentay filed a motion for partial summary judgment, seeking a constructive trust, a writ of ejectment, and attorney fees and costs.

6

Perez opposed the motion as a self-represented litigant, arguing that the evidence Pelentay relied upon were violations of the dead man's statute, parol evidence rule, and rule against hearsay, among others. Perez contended that the deeds conveying the property to him were unambiguous, recorded, in compliance with chapter 64.04 RCW, and that any later conveyances by Betty were ineffective because she no longer had an interest to convey.

On March 6, 2024, the superior court granted Pelentay's motion for partial summary judgment. The superior court found that Betty lacked the present intent to deliver the July 24, 2021 deed that Perez recorded. The superior court also found that there was no issue of material fact as to Betty's intent to transfer the property to Perez; that Betty, Perez, and Linda had "never reached a meeting of the minds;" and that no valid agreement was ever formed. CP at 1674. The superior court ordered quiet title in favor of Pelentay as trustee, authorized sale of the property, authorized a writ of ejectment, and granted attorney fees and costs to Pelentay.

On April 3, 2024, Perez and Linda, now represented by counsel, timely filed a notice of appeal. Subsequently, the superior court granted Perez and Linda's motion to stay judgment and sale of the property pending the appeal.

ANALYSIS

A.  SUBJECT MATTER JURISDICTION

Perez contends that the superior court lacked subject matter jurisdiction over the case.  Perez acknowledges that superior courts have jurisdiction over probate matters, but that whether the case was properly before the court as a probate matter is "consequential," because TEDRA petitions are "generally placed on a fast track that limits discovery and does not allow a jury trial."  Br. of Appellant at 17, 18.  Perez argues that the question before the court was not a probate matter; rather, the issue was whether an in vivo warranty deed was valid.  We disagree.

Whether a particular court has jurisdiction is a question of law we review de novo.  *Young v. Clark*, 149 Wn.2d 130, 132, 65 P.3d 1192 (2003).  "Where a court lacks subject matter jurisdiction to issue an order, the order is void."  *Buecking v. Buecking*, 179 Wn.2d 438, 446, 316 P.3d 999 (2013), *cert. denied*, 574 U.S. 869 (2014).

"Under TEDRA, superior courts have original subject matter jurisdiction over trusts 'and all matters relating to trusts.'"  *Matter of Estate of Ferara*, 29 Wn. App. 2d 139, 162, 540 P.3d 194 (2023) (quoting RCW 11.96A.040(2)).  A "matter" under TEDRA includes the "determination of any question arising in the administration of an estate or trust, or with respect to any nonprobate asset, or with respect to any other asset or property interest passing at death."  RCW 11.96A.030(2)(c).  "TEDRA gives courts broad authority to 'proceed with such administration and settlement in any manner and way that to the court seems right and proper, all to

8

the end that the matters be expeditiously administered and settled by the court.'" *Ferara,* 29 Wn. App. at 164 (quoting RCW 11.96A.020(2)).

The superior court had subject matter jurisdiction to hear the TEDRA petition. This was an action brought by the trustee, Pelentay, for the recovery of property alleged to have passed to the Quach Living Trust upon Betty's death. This was a trust matter and, therefore, within the original subject matter jurisdiction of the superior court under TEDRA.[3] RCW 11.96A.040(2).

B. PARTIAL SUMMARY JUDGMENT

Perez argues that the July 2021 deeds transferred the property from Betty to him, and that, because the deeds are facially valid and unambiguous, any evidence subsequent to July 24, 2021 is irrelevant, hearsay, and in violation of the parol evidence rule or dead man's statute. Perez contends that Betty deeded away any interest she had in the property in July 2021, so none of her subsequent acts, which he characterizes as a "change of heart," matter to the determination of ownership of the property. Br. of Appellant at 25. Perez also asserts that the superior court should have granted his motion to strike many of Pelentay's

---

[3] Perez makes a passing reference to "probate venue" in his assignments of error. Br. of Appellant at 4. Venue was an issue that Perez raised at the superior court, but Perez makes no arguments in his appellate brief relating to the issue. Therefore, Perez has waived any attempted challenge to "probate venue" on appeal. *See Cowiche Canyon Conservancy v. Bosely,* 118 Wn.2d 801, 809, 828 P.2d 549 (1992). Regardless, venue was proper because the property at issue was located in the same county as the superior court. *See* RCW 11.96A.050(1)(b) (Venue is appropriate for trusts in the superior court of "the county where any real property that is an asset of the trust is located.").

summary judgment exhibits because they violated the parol evidence rule and dead man's statute.[4]  We disagree.

1.     Motion to Strike

In order to determine whether the superior court properly granted partial summary judgment, we must first determine if the superior court properly considered only admissible evidence.  *See Burmeister v. State Farm Ins. Co.*, 92 Wn. App. 359, 365, 966 P.2d 921 (1998) (Courts should "consider only admissible evidence in a motion for summary judgment.").  The superior court appears to have denied Perez's motion to strike when it stated in the partial summary judgment order that the court considered all of the submitted exhibits.

"We review a trial court's evidentiary rulings for an abuse of discretion." *Gilmore v. Jefferson County Pub. Transp. Benefit Area*, 190 Wn.2d 483, 494, 415 P.3d 212 (2018).  A court abuses its discretion when its rulings are manifestly unreasonable or based on untenable grounds.  *Id.*

---

[4] In his appellate brief, Perez does not identify any specific evidence as being violative of the dead man's statute.  When questioned at oral argument about specific evidence of violations of the dead man's statute, Perez suggested that certain emails were violations.  Wash. Ct. of Appeals oral arg., *In Re Quach Living Trust*, No. 86535-8-I (Apr. 22, 2025), at 18 min., 21 sec., https://www.tvw.org/watch/?clientID=9375922947&eventID=2025041404&startStreamAt=1101&stopStreamAt=1165.

Issues appealed which are not supported by references to the record should not be considered.  *See* RAP 10.3(a)(6); *Satomi Owners Ass'n v. Satomi, LLC*, 167 Wn.2d 781, 808, 225 P.3d 213 (2009) (Without adequate and cogent briefing, the court should decline to consider an issue.).  Moreover, the dead man's statute does not bar documentary evidence.  *Thor v. McDearmid*, 63 Wn. App. 193, 202, 817 P.2d 1380 (1991).  Beyond counsel's limited reference to documentary evidence at oral argument, we are left to speculate as to the scope and specifics of the alleged dead man's statute violations.  Therefore, we decline to address the issue.

The parol evidence rule states, "'extrinsic evidence is not admissible to add to, subtract from, vary, or contradict written instruments which are contractual in nature and which are valid, complete, unambiguous, and not affected by accident, fraud, or mistake.'" *Emrich v. Connell*, 105 Wn.2d 551, 555-56, 716 P.2d 863 (1986) (quoting *Buyken v. Ertner*, 33 Wn.2d 334, 341, 205 P.2d 628 (1949)). The rule applies only to writings intended by the parties to be an integration or, "final expression of the terms of the agreement." *Id.* at 556. In making the determination of whether the parties intended the written document to be a final expression of terms, the court, acting as fact finder, must consider all relevant extrinsic evidence. *Id.*

Here, the parties do not dispute the terms of the July 24, 2021 deeds. Rather, the parties dispute the validity of the July 24 deeds. Thus, the challenged evidence was not used to "add to, subtract from, vary, or contradict" the deeds in violation of the parol evidence rule.[5] *Id.* at 555 (quoting *Buyken*, 33 Wn.2d at 341).

When there is no agreement, the parol evidence rule is inapplicable. *See id.* at 555-56. The record shows that the superior court considered the extrinsic evidence to determine whether the parties had reached an agreement at the time of the July 24, 2021 deeds. That was proper. Determining that they had not

---

[5] Perez relies on *Newport Yacht Basin Ass'n of Condo. Owners v. Supreme Nw., Inc.*, 168 Wn. App. 56, 60, 277 P.3d 18 (2012), for the proposition that extrinsic evidence should not be considered when a deed is clear and unambiguous. However, in *Newport Yacht*, the court addressed whether extrinsic evidence could be used to show that the grantor intended to convey a lesser interest than the fee simple interest indicated in the deed. *Id.* at 60-61. Thus, the terms of the deed were disputed, but that a valid conveyance was made was not. *Id.* at 72. Here, unlike in *Newport Yacht*, whether the interests in the July 24 deeds were validly conveyed is at issue, not the terms of the deeds.

reached an agreement, the superior court did not abuse its discretion in rejecting Perez's parol evidence challenge.[6]

2.    Grant of Partial Summary Judgment

"We review summary judgment orders de novo, engaging in the same inquiry as the trial court.  Summary judgment is warranted only when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law." *Northgate Ventures LLC v. Geoffrey H. Garrett PLLC*, 10 Wn. App. 2d 850, 856, 450 P.3d 1210 (2019).  We view all facts and reasonable inferences in the light most favorable to the nonmoving party.  *Id.*

The issue before the superior court was whether the July 24, 2021 deeds were conveyed.  "A deed does not take effect until delivery."  *Raborn v. Hayton*, 34 Wn.2d 105, 109, 208 P.2d 133 (1949).[7]  "To constitute a delivery, it must clearly appear that it was the intention of the grantor that the deed would pass title *at the time*." *Anderson v. Ruberg*, 20 Wn.2d 103, 107, 145 P.2d 890 (1944) (emphasis added).  "The intention may be made manifest by acts or words of both or by one without the other, but what is said or done must clearly manifest the intention of

---

[6] Perez argues that Pelentay's motion for partial summary judgment should have been stricken because it contained "over two hundred [technical] errors in violation of LCR 7."  Br. of Appellant at 3.  Perez fails to provide any argument on appeal to support this challenge.  We do not consider issues on appeal "not supported by any reference to the record, nor by any citation of authority." *Cowiche Canyon Conservancy*, 118 Wn.2d at 809.  Without any identification as to what these two hundred technical errors are, we decline to consider the issue.

[7] At oral argument, Perez's counsel agreed that delivery is necessary for a deed's conveyance to be valid.  Wash. Ct. of Appeals oral arg., *In Re Quach Living Trust*, No. 86535-8-I (Apr. 22, 2025), at 3 min., 34 sec., https://www.tvw.org/watch/?clientID=9375922947&eventID=2025041404&startStreamAt=214&stopStreamAt=272.

the grantor that the deed shall *at once* become operative and that the grantor shall lose control over [the deed]." *Puckett v. Puckett*, 29 Wn.2d 15, 19, 185 P.2d 131 (1947) (emphasis added). "Possession by the grantee raises a presumption of delivery, with its included intent, that can be rebutted only by clear and convincing evidence." *Raborn*, 34 Wn.2d at 109.

Perez's possession of the July 24, 2021 deeds raised a presumption that Betty had intended to convey the property to him at the time the deeds were executed. However, as to the issue of Betty's intent to deliver with regard to the July 24, 2021 deeds, the undisputed evidence shows that Betty did not have the intent to deliver the July 24 deeds on that date because the transfer of the property was conditional, and Betty was in an ongoing process of deciding how to dispose of the property.

The undisputed record shows that Betty executed multiple deeds purporting to convey the property—six deeds during a five-week period. And Betty made frequent and significant changes to her letters of last wishes during that same period. Further, as evidenced by Betty's email to Pelentay on August 11, Betty considered the agreement to transfer the property to Perez as "not yet final." CP at 1083. Betty's later text message to Pelentay on August 22 clearly stated Betty's decision to sell the property upon Betty's death.

The undisputed record also shows that Perez never fulfilled the conditions discussed by the parties before Betty's death, including Perez paying Betty $50,000, and providing a six-month tenancy or payment of equivalent value to Bangs. Linda even accepted and endorsed Betty's cashier's check that returned

13

the funds Perez and Linda had advanced towards the purported purchase of the property.

Perez did not refute Pelentay's evidence to create a genuine issue of material fact that Betty did not have the intent to deliver the July 24, 2021 deeds on that date. Instead Perez merely asserted that Pelentay's evidence was inadmissible, that the deed conveyances were valid because the deed was unambiguous, and that Betty's two subsequent conveyances to him reinforced her intent to convey. Perez also asserts that while consideration may "not have been finalized immediately after the deed executions," he did settle "the debt on the house at $353,500.00." CP at 1416.

Perez was entitled to the presumption that the July 24 deeds were valid based on his possession of the deeds. *See Raborn*, 34 Wn.2d at 109. But this presumption was rebutted by the undisputed evidence that clearly and convincingly showed Betty did not deliver the July 24 deeds because she did not intend to pass title to Perez on that date; the deeds were conditioned on terms that Perez did not meet before Betty's death. The record shows continuing negotiations between Perez and Betty after July 24; Betty's subsequent purported conveyances of the property; Betty's return of any advanced funds for the property to Linda, which Linda accepted; and the surrounding context that Betty was terminally ill and in the midst of ongoing decision-making on how to dispose of her possessions, which is evidenced by her changing letters of last wishes.

As to the critical issue of whether the July 24 deeds were delivered and, thus, valid, the undisputed record shows that Betty did not intend for title to the

property to pass to Perez on the day Betty executed the July 24 deeds. Therefore, there is no genuine issue as to material fact that the July 24 deeds did not transfer title of the property to Perez on July 24. Accordingly, the superior court did not err in finding that Pelentay was entitled to judgment as a matter of law, nor in granting partial summary judgment in favor of Pelentay.[8]

## C. PEREZ'S MOTIONS FOR LEAVE TO AMEND

Perez argues that the superior court erred in denying his motions for leave to amend. Perez contends that his four motions for leave to amend his pleading document should have been granted. He asserts that the superior court's rulings were based on technical grounds and in violation of CR 15(a), which directs such motions to be "freely given when justice so requires." We disagree.

"CR 15(a) governs amendments to pleadings and specifically provides that 'a party may amend [his] pleading only by leave of court . . . and leave shall be freely given when justice so requires.'" *Hook v. Lincoln County Noxious Weed Control Bd.*, 166 Wn. App. 145, 159, 269 P.3d 1056 (2012) (alterations in original) (quoting CR 15(a)). When "'a party moves to amend a pleading, a copy of the proposed amended pleading, denominated "proposed" and unsigned, shall be

---

[8] Perez makes passing reference to the superior court's "one-sentence denial of his motion for reconsideration." Br. of Appellant at 2. Perez requests that the denial be vacated. Because we affirm the superior court's order granting partial summary judgment, the trial court did not abuse its discretion in denying Perez's motions for reconsideration. *See Hernandez v. Edmonds Memory Care, LLC*, 10 Wn. App. 2d 869, 883, 450 P.3d 622 (2019) ("This court reviews a trial court's denial of a motion for reconsideration for an abuse of discretion. Because we affirm the superior court's order awarding the laborers attorney fees, the superior court did not abuse its discretion by denying EMC's motion for reconsideration on this issue." (footnote omitted)).

attached to the motion.'" *Id.* (quoting CR 15(a)). When the word "shall" is used, it is "presumptively imperative and operates to create a duty." *Id.* The opposing party and the court have legitimate needs in seeing the proposed amended pleading to "address and assess relevant issues of prejudice and futility." *Id.*

A trial court's denial of a motion to amend a pleading is reviewed for manifest abuse of discretion. *Ives v. Ramsden*, 142 Wn. App. 369, 386, 174 P.3d 1231 (2008). "A trial court abuses discretion when its decision is based on untenable grounds or reasons." *Wilcox v. Lexington Eye Inst.*, 130 Wn. App. 234, 241, 122 P.3d 729 (2005), *review denied*, 157 Wn.2d 1022 (2006).

Despite being informed by the superior court of CR 15's requirements, Perez failed to attach a "proposed amended pleading" in every motion to amend that he filed. Perez's third motion to amend included an attached document titled, "Respondent's Motion to Amend Response ('Opposition') to Complaint to Add Counterclaims and Defenses." CP at 856. However, this document did not comply with the requirements of CR 15(a)—that an amended pleading, denominated "proposed," be attached to the motion to alert the court and parties of the precise amendment sought.

At the hearing on Perez's second motion to amend, the superior court explained to Perez what was defective about his motion for leave to amend, "[P]er the court rules, you did not provide a copy of your proposed amended complaint." Verbatim Rep. of Proc. at 29. The superior court wrote in its order denying Perez's next motion to amend, "Respondents' Motion fails to adhere to the requirements of Civil Rule 15(a)—specifically Respondents failed to provide a copy of their

'proposed amended pleading.'" CP at 1650. Despite clear direction by the court as to what was required from Perez to amend his pleading, Perez failed to comply.

In light of the record before us, the superior court did not abuse its discretion in denying Perez's defective motions for leave to amend.

D.    JUDICIAL BIAS

Perez argues that the superior court judge was biased, either against him "personally or pro se litigants generally." Br. of Appellant at 14. As evidence of the superior court's bias, Perez points us to the superior court judge admonishment of "both parties for the sin of supposedly taking up too much of its time," Perez being told "to get an attorney," the superior court refusing to hear "further motions to shorten time," the superior court telling the parties "that the case had taken up too much of the court's time and that it was somehow a bad thing that the clerks at the court knew about the case." Br. of Appellant at 14-15. And "most substantively," Perez points to the superior court's denial of his motions to add counterclaims. Br. of Appellant at 15. On this record we do not find evidence of judicial bias.

"Under the appearance of fairness doctrine, a judicial proceeding is valid only if a reasonably prudent, disinterested observer would conclude that the parties received a fair, impartial and neutral hearing." *State v. Gamble*, 168 Wn.2d 161, 187, 225 P.3d 973 (2010). "Evidence of a judge's actual or potential bias is required." *In re Marriage of Meredith*, 148 Wn. App. 887, 903, 201 P.3d 1056, *review denied*, 167 Wn.2d 1002 (2009). "A trial court is presumed to perform its functions regularly and properly without bias or prejudice." *Id.*

17

Perez supports his claim of judicial bias by citing to the judge advising him to hire a lawyer. Indeed, the superior court judge identified for Perez the resources where he might seek legal support and identified free legal clinics available through the King County Bar Association or Washington State Bar Association. This is not evidence of bias.

Perez also supports his claim of judicial bias by contending the superior court was frustrated by the case. The record reflects that the superior court judge was frustrated, but that frustration was directed at both parties. The record shows that Perez filed 19 motions, and Pelentay filed 14 motions, all between May 2023 and March 2024. The superior court judge admonished both parties for their excessive motion practice, and chastised Pelentay's counsel for objecting during oral arguments at the summary judgment hearing. We find no evidence of actual or potential bias on the part of the superior court judge against Perez or against self-represented litigants; whatever frustrations the judge expressed on the record were directed at both parties.

E.    ATTORNEY FEES

Perez argues that the superior court erred in granting attorney fees to Pelentay because Perez should have prevailed below. And Perez asks us for fees on appeal, arguing that the appeal is not frivolous and appellate fees to Pelentay would be "unconscionable." Reply Br. of Appellant at 32. Pelentay also asks us for fees and costs on appeal pursuant to RAP 14.2, RAP 18.1, and RCW 11.96A.150.

1.      Attorney Fees at the Superior Court

"An award of attorney fees is left to the trial court's discretion and will not be disturbed absent a clear showing of abuse." *Matter of Pearsall-Stipek*, 136 Wn.2d 255, 265, 961 P.2d 343 (1998).  Under TEDRA, RCW 11.96A.150(1) grants the superior court and any court on appeal the discretion to order "costs, including reasonable attorneys' fees, to be awarded" as "the court determines to be equitable."  The court may consider any factors that it deems relevant and appropriate.  RCW 11.96A.150(1).

The superior court ordered that Pelentay be awarded her attorney fees and costs "pursuant to RCW 11.96A.150." CP at 1677.  Pelentay was the prevailing party, and RCW 11.96A.150 provided a basis for the superior court to award her attorney fees and costs.  We find that the superior court did not abuse its discretion in granting Pelentay attorney fees.

2.      Attorney Fees on Appeal

We have discretion to grant attorney fees on appeal.  *MacKenzie v. Barthol*, 142 Wn. App. 235, 242, 173 P.3d 980 (2007).  "Reasonable attorney fees are recoverable on appeal only if allowed by statute, rule, or contract, and RAP 18.1(a)." *Malted Mousse, Inc. v. Steinmetz*, 150 Wn.2d 518, 535, 79 P.3d 1154 (2003).

"RAP 18.1(b) requires a party to 'devote a section of its opening brief to the request for the fees or expenses.'" *Gardner v. First Heritage Bank*, 175 Wn. App. 650, 676-77, 303 P.3d 1065 (2013) (quoting RAP 18.1(b)).  Failure to provide citations to authority or arguments in favor of a fee request is a failure to comply

19

with RAP 18.1(b), and will result in denial of the request for attorney fees. *Id.* at 677.

Perez requests attorney fees on appeal. He supports his request for fees on appeal in his opening brief by stating: "Fees on appeal should be awarded to the Appellant." Br. of Appellant at 23. And in his conclusion, he writes, "This court should award attorney fees, court cost, or any other costs related to this appeal to the Appellant." Br. of Appellant at 58. Without any citations to authority or arguments to comply with RAP 18.1(b), his request for attorney fees is denied.

Pelentay also requests attorney fees and costs on appeal, citing RAP 14.2, RAP 18.1, and RCW 11.96A.150. As the prevailing party on appeal, with a statutory basis for her request under RCW 11.96A.150(1), we grant Pelentay's request for her reasonable attorney fees and costs.

We affirm.

_____
J., J

WE CONCUR:

_____
Chung, J.

_____

20