57 P.3d 1166 (2002)
112 Wash.App. 1
In re MARRIAGE OF Jon Erik GRIGSBY, Respondent, and
Donna Rice (fka Donna Grigsby), Appellant.
No. 48226-2-I.
Court of Appeals of Washington, Division 1.
February 11, 2002.
Publication Ordered June 4, 2002.
*1167 Catherine W. Smith, Edwards, Sieh, Smith and Goodfriend, Seattle, WA, Lynn M. Hicks, Langley, WA, for Appellant.
Charles K. Wiggins, Kenneth W. Masters, Bainbridge Is, WA, Kenneth E. Brewe, Attorney at Law, Everett, WA, for Respondent.
GROSSE, J.
Donna Rice (formerly known as Donna Grigsby) appeals from the trial court's order prohibiting her from relocating with the parties' minor children, and the court's modification of the parties' parenting plan naming her former husband Jon Grigsby as the "primary care parent." Under the procedures and standards provided in RCW 26.09.405 through RCW 26.09.560, there is a rebuttable presumption that relocation will be permitted that may be rebutted by a showing that the detrimental effect of the relocation will outweigh any potential benefit. The trial court properly analyzed the statutory factors set forth in RCW 26.09.520 and found that the detriments of the proposed relocation outweighed the benefits. The record supports the court's findings of fact as to each of these factors. However, because Rice was no longer actively pursuing relocation, there was no substantial change in circumstances, and none of the factors contained in RCW 26.09.260(2) were present, the trial court was without authority to modify the parenting plan. We therefore affirm the trial court's order prohibiting relocation, but reverse the order modifying the parties' parenting plan.

FACTS
Jon Grigsby and Donna Rice met in Colorado in 1990. Their son Geoff was born on April 28, 1991. Grigsby and Rice married on October 20, 1992. Their son Devin was born on April 14, 1993. Grigsby and Rice were divorced in Colorado on March 6, 1995. At that time, Grigsby and Rice entered into a "memorandum of understanding" concerning *1168 parenting. The two agreed to joint legal custody and agreed that Rice would have primary residential custody of the boys. The court in Colorado approved this agreement.
In the summer of 1997, Grigsby and Rice both decided to move to Washington State. The two visited Washington together in June of 1997. Approximately three weeks before the scheduled move, Rice changed her mind and decided to stay in Colorado. Having already closed his business in Colorado, Grigsby decided to proceed with the move. In September of 1997, Grigsby moved to Monroe, Washington.
From September of 1997 through June of 1998, the boys lived with their mother in Colorado. During this time, the boys missed their father very much. Geoff had a particularly difficult time adjusting to his father's move. Grigsby visited the boys from time to time and regularly spoke to them on the phone. The boys spent Christmas of 1997 and spring break of 1998 visiting their father in Washington. The boys also stayed with their father in Washington in June and July of 1998 while Rice visited her boyfriend (now fiancé) in Kentucky.
In early 1998, Rice was unhappy in Colorado and began contemplating a move. Grigsby's parents,[1] Bill and Paula Grigsby, were interested in where Rice was moving because they wanted to move from their ranch in Wyoming to be closer to their grandchildren. Rice decided to move to Washington State. While Rice visited her boyfriend in Kentucky, Grigsby's parents came to Washington to look at homes. Rice, Grigsby, and his parents all decided to move to Whidbey Island, although Rice had never been there before. Grigsby's parents bought a house for Rice and the boys to live in.[2] In August of 1998, the whole clan moved to Whidbey Island.
Rice testified that she disliked living on Whidbey Island from the beginning. Rice's fiancé took a job as a strength and conditioning coach in Colorado in 2000. In April of 2000, Rice told Grigsby that she wanted to move to Colorado with the boys. When Grigsby's mother found out about Rice's plans, she tried to get a job for Rice's fiancé in Washington. She also offered to allow Rice and her fiancé to live rent free in the house she had purchased for Rice and the boys, and further offered to pay them $25,000 a year to stay in Washington. When Rice refused the offer, Grigsby petitioned for a temporary restraining order to prevent Rice from relocating with the boys. He also sought modification of the parenting plan due to the proposed relocation.
In May of 2000, the court entered an order restraining either parent from moving the boys out of state pending trial. Shortly after the order was entered, Rice's fiancé was offered a job as a strength coach with a professional basketball team in Dallas. Rice then changed her plans to relocate to Colorado and announced her intention to move instead to Dallas, Texas.
Following a three-day trial, the court made extensive findings of fact, considering the statutory factors in RCW 26.09.520. The court found that relocation was not in the best interests of the children and restrained Rice from relocating the children. Immediately after the court orally announced its decision on November 20, 2000, Rice's attorney indicated that her client would be staying in Washington.
The court did not modify the parenting plan at the November hearing, but rather left it to the parties to bring the matter before the court if they thought it necessary. Another hearing was held on January 16, 2001.[3] At that date, the court modified the parenting plan to make Grigsby the "primary care parent." The residential schedule was minimally altered such that the boys would be with Grigsby a slight majority of the time.
Rice appeals, arguing that the trial court erred in restraining her from relocating with the boys. She also argues that the trial court erred in modifying the parenting plan *1169 after she announced her intention to remain in Washington.

DISCUSSION

Order Denying Relocation
Under the provisions of the notice requirements and standards for parental relocation, RCW 26.09.405 through RCW 26.09.560, courts have the authority to "allow or not allow a person to relocate the child." RCW 26.09.420. In enacting these provisions, the Legislature specifically stated that its intent was to supersede the Supreme Court's decisions in In re Marriage of Littlefield and In re Marriage of Pape.[4]
In Littlefield, the court held that a court may not prohibit a parent from relocating a child unless relocation would harm the child. The court further held that the harm to the child must be "more than the normal distress suffered by a child because of travel, infrequent contact of a parent, or other hardships which predictably result from a dissolution of marriage."[5]
The decision in Pape further restricted the authority of courts to prohibit a parent from relocating a child. In Pape, the court held that while a court making an initial residential placement determination should consider the best interests of the child, a court determining whether to allow relocation must presume that the best interests of the child require the primary placement remain intact. The effect of this holding is that a primary residential parent will be able to relocate a child unless circumstances aside from the relocation would favor a change in the residential schedule of the child.
In a modification action the presumption is in favor of "custodial" continuity, not environmental stability or environmental continuity. It is only where the nonprimary residential parent overcomes that presumption by showing continued placement with the other parent is not in the child's best interest that the principal residence of the child may be changed.[[6]]
The Relocation Act of 2000 reflects a disagreement with the rationale of these cases and gives courts the authority to allow or disallow relocation based on the best interests of the child. Under RCW 26.09.520, there is a rebuttable presumption that the intended relocation of the child will be permitted. But the parent objecting to the relocation may rebut this presumption by demonstrating that the detrimental effect of the relocation will outweigh the benefits of relocation to the child and the relocating person. RCW 26.09.520 lists factors for the court to consider in determining whether relocation should be permitted. These factors are:
(1) The relative strength, nature, quality, extent of involvement, and stability of the child's relationship with each parent, siblings, and other significant persons in the child's life;
(2) Prior agreements of the parties;
(3) Whether disrupting the contact between the child and the person with whom the child resides a majority of the time would be more detrimental to the child than disrupting contact between the child and the person objecting to the relocation;
(4) Whether either parent or a person entitled to residential time with the child is subject to limitations under RCW 26.09.191;
(5) The reasons of each person for seeking or opposing the relocation and the good faith of each of the parties in requesting or opposing the relocation;
(6) The age, developmental stage, and needs of the child, and the likely impact the relocation or its prevention will have on the child's physical, educational, and emotional development, taking into consideration any special needs of the child;
(7) The quality of life, resources, and opportunities available to the child and to the relocating party in the current and proposed geographic locations;
(8) The availability of alternative arrangements to foster and continue the child's relationship with and access to the other parent;

*1170 (9) The alternatives to relocation and whether it is feasible and desirable for the other party to relocate also;
(10) The financial impact and logistics of the relocation or its prevention; and
(11) For a temporary order, the amount of time before a final decision can be made at trial.
Following a three-day trial, the court found that the detrimental effects of relocation would outweigh the benefits of change to the children and their mother. In coming to this conclusion, the court explicitly considered the 10 applicable statutory factors enumerated in RCW 26.09.520.[7] In so doing, the court entered 10 corresponding findings of fact.
Rice assigns error to 8 of these 10 findings.[8] Findings of fact will be upheld if they are supported by substantial evidence.[9] As the party challenging the findings of fact, Rice bears the burden of demonstrating that substantial evidence does not exist. She fails to meet this burden as to each of the challenged findings.
Finding of Fact 2.2.1, regarding the relative strength, nature, quality, extent of involvement, and stability of the child's relationship with each parent, siblings, and other significant persons in the child's life:
Rice's principal quarrel with finding 2.2.1 is that the trial court failed "to properly recognize the significance of the children's attachment to their mother, their historical primary parent and designated primary custodian in all residential schedules until these proceedings." Brief of Appellant at 25. The court's findings do acknowledge that the mother was the "primary parent." But the court also found that the father was very involved with the children and when the children moved to Washington in 1998, the children spent approximately an equal amount of time with each parent. The court also found that the father was more involved in the children's school and after school activities than was the mother. This finding is amply supported by the testimony at trial, including testimony that the father took the children to their doctors' appointments and after school activities, and was more actively involved with his children's sporting and scouting activities than was the mother. The fact that the father's more flexible work schedule enabled him to be more involved has no bearing on the validity of this finding.
While RCW 26.09.540 provides that relocation may not be prohibited on the sole objection of a third party, the children's relationship with "significant persons" in their lives is a proper factor for the court to consider. The court therefore properly considered the nature of the children's relationship with their grandparents, and with their mother's fiancé. The court's finding that the children were strongly attached to their paternal grandparents is well supported by the record. The guardian ad litem report indicated that the children had significant and meaningful bonds with the grandparents. The grandparents saw the boys frequently when they were with their father. On the mother's scheduled days with the boys, their grandmother picked them up from school during the week and took care of them until their mother picked them up after work, and she took care of them on Saturdays when their mother worked. The grandmother testified that she saw the boys nearly every day.
The record does support the court's finding that the children had minimal contact with the mother's fiancé. Although he had been dating their mother for over five years at the time of trial, he rarely spent time with the boys, and he did not even know their birthdays. The court also made a finding that the boys had never been to Dallas. Rice argues that the court erred in considering this fact in making its determination. But when viewed in context, the court properly considered the fact that the boys had never been to Dallas, even for a visit. The boys had strong ties to Whidbey Island, and had *1171 strong relationships there with their school, scouting groups, sports teams, friends, and family. Conversely, the boys had no ties to Dallas. Aside from their mother, the only person they would know in Dallas would be their mother's fiancé, with whom they did not have a strong relationship. This finding is supported by substantial evidence.
Finding of Fact 2.2.2, regarding prior agreement of the parties:
The trial court found that the parties had agreed to joint legal custody and, since the move to Washington, had entered into an "equal residential agreement" with regards to the children. The record supports this finding. The testimony at trial was that the boys spent an approximately equal amount of time with each parent. The court also found that if the mother moved to Dallas residential time would not be possible. The record supports this finding, if something of a truism. As Rice points out, virtually no existing parenting plan could continue after a move out of state. Nonetheless, the court properly analyzed this factor.
Finding of Fact 2.2.3, as to whether disrupting contact between the children and Grigsby would be more disruptive than disrupting contact between the children and Rice:
Here, the court found that disrupting contact with Grigsby would be more detrimental to the children than disrupting contact with Rice. This finding was based in part on the fact that the boys were "at times inconsolable" when they were away from their father. Additionally, since learning that he might be moving away from his father, the younger boy had experienced difficulties in school, had an increase in stomachaches, and cried at times because he feared being separated from his father. The record supports this finding. Obviously, being separated from either parent would be disruptive to almost every child. RCW 26.09.520(3) requires the court to make a judgement call as to separation from which parent would cause the most disruption. The court was within its discretion in finding that the boys would be more disrupted by separation from their father.
Finding of Fact 2.2.6, regarding the age, developmental stage, and needs of the children, and the likely impact the relocation would have on the children's physical, educational, and emotional development, taking into consideration any special needs of the children:
The court found that the oldest child, Geoff, had great difficulties the last time he relocated. And the younger child, Devin, had been getting into trouble at school and having stomachaches since his mother announced her intention to move. These facts are supported by substantial evidence. Additionally, in considering this factor, the court found that missing the activities they enjoyed on Whidbey Island would adversely impact the boys. The record does indicate that both boys were quite involved in the outdoor activities available to them on Whidbey Island. The impact of the relocation on the boys' physical welfare was properly considered.
The court also found that difficulties in adjustment would be compounded by loss of access to their father and grandparents. Rice's contention that virtually all relocations would involve a decrease in contact with one parent has merit. But in this case, the boys were particularly attached to their father and grandparents, and Grigsby and his parents were particularly involved in the boys' lives. The court did not err in considering the closeness of the boys' relationship with their father and grandparents.
The court also noted that the boys' adjustment to living with their mother's fiancé would be a "further disruption." This, too, was a proper consideration. The boys had never lived with their mother's fiancé, and had very little contact with him in the past few years. The situation would be complicated by the fact that this individual would be in and out of the boys' lives since he would spend a significant amount of time travelling with the Dallas professional basketball team. Finally, while Rice and her fiancé had been dating for several years, they were not married, and had not lived together for any significant amount of time. The court properly considered the tenuous nature of their relationship in assessing the emotional needs of the children.
*1172 Finding of Fact 2.2.7, regarding the quality of life, resources, and opportunities available to the children and relocating party in the current and proposed geographic locations:
The court found that living in the rural setting of Whidbey Island, with access to the nearby urban setting of Seattle, was more beneficial to the children's well being than the setting in Dallas. This finding is supported by substantial evidence. The boys were very involved in sports, scouting, and various other activities on Whidbey Island. The boys enjoyed the outdoor activities available in their community, and the testimony showed that they thrived once settling in on Whidbey Island. Rice argues that the trial court did not fully consider the advantages available to the boys in Dallas. But if this is true, it is because little to no evidence of any advantages was presented to the court. Rice had only visited Dallas once, for less than a week, and therefore seemed to know little about what Dallas had to offer. The boys had never even been to Dallas. The court properly analyzed this factor.
Finding of Fact 2.2.8, regarding the availability of alternative arrangements to foster and continue the children's relationship with and access to the other parent:
Contrary to Rice's contention, the court did not find that no such alternatives existed. Rather, the court found that no alternative arrangements existed other than Grigsby following Rice to Dallas, or making frequent trips to visit the children. The court also found that no acceptable arrangements would exist if the boys stayed in Washington and Rice moved to Dallas alone. As the court found, neither alternative would be truly acceptable for the children. The court properly analyzed this factor.
Finding of Fact 2.2.9, regarding the feasibility and desirability of the other party relocating also:
The court found that while it was possible for Grigsby to move, such a move would not be desirable given that doing so would force Grigsby to lose his investment of time and money in his yoga studio. Rice clearly views Grigsby's yoga studio as more of a hobby than a true business. This is a subject on which good minds could differ. Had the trial court found that it was feasible and desirable for Grigsby to move based on a finding that Grigsby's means of support was not really the yoga studio, but rather the largess of his parents, that finding would have been supported by the record. But the court's finding here is also supported by substantial evidence. In the end, such a determination turns on the credibility of the parties and their sincerity, which is the province of the trial court.
Finding of Fact 2.2.10, regarding the financial impact and logistics of the relocation or its prevention:
The court found that there would be a detrimental financial impact on Grigsby if he moved to Dallas along with Rice. The record supports this finding. Grigsby owned a business that was just beginning to turn a profit on Whidbey Island. Rice correctly points out that the court did not consider the impact on the parties if there was no move. But nothing in the record demonstrates that Rice would be better off financially if she moved to Dallas.[10] In any event, the trial court indicated in its oral opinion that this factor had little or no impact on its decision.
In sum, the trial court's findings are all supported by substantial evidence in the record. The decision of whether the proposed relocation would be detrimental to the children is inherently a subjective one, given the statutory scheme. The trial court did not err in finding that the detrimental effects of relocation would outweigh the benefits of change to the children and to Rice.

Modification of the Residential Schedule
RCW 26.09.260(6) provides that a court may order adjustments to the residential aspects of a parenting plan pursuant to a proceeding to permit or restrain a relocation of the child. Rice argues that the trial court erred in modifying the residential schedule without a "substantial change in circumstances" as required by RCW 26.09.260(1), *1173 and without a basis for modification under the factors enumerated in RCW 26.09.260(2). RCW 26.09.260(1) requires a finding of a substantial change in circumstances prior to modification of a parenting plan, except as provided in subsections (4), (5), (6), (8), and (10) of RCW 26.09.260. RCW 26.09.260(6) is the subsection governing relocation cases. That section provides:
The court may order adjustments to the residential aspects of a parenting plan pursuant to a proceeding to permit or restrain a relocation of the child. The person objecting to the relocation of the child or the relocating person's proposed revised residential schedule may file a petition to modify the parenting plan, including a change of the residence in which the child resides the majority of the time, without a showing of adequate cause other than the proposed relocation itself. A hearing to determine adequate cause for modification shall not be required so long as the request for relocation of the child is being pursued. In making a determination of a modification pursuant to relocation of the child, the court shall first determine whether to permit or restrain the relocation of the child using the procedures and standards provided in RCW 26.09.405 through 26.09.560. Following that determination, the court shall determine what modification pursuant to relocation should be made, if any, to the parenting plan or custody order or visitation order.
As the statute states, a parent objecting to the relocation may file a petition to modify the parenting plan "without a showing of adequate cause other than the proposed relocation itself." Ordinarily, in a relocation case, it will not be necessary for the court to consider whether there is a substantial change in circumstances, or to consider the factors contained in RCW 26.09.260(2).
However, in this case, after the court restrained Rice from relocating with the children, Rice decided not to relocate at all. The court nonetheless modified the parenting plan. It gave the following rationale for its decision:
I want to retain the status quo as much as possible. But I also believe that it is necessary to change the custodial parent from the mother to the father simply so that we don't have this type of situation should the mother's fiancé get moved someplace else and the issue changes. But in changing the custodial parent, which I believe that the statute allows the Court to do, because it would protect the child from emotional harm of any proposed relocation in the future, I also believe that the interaction between the father and the children and the interaction between the mother and the children should remain essentially the same. That is, a 50/50 shared arrangement but with the custody of the child or at least the custodial parent being named as the father here.[[11]]
The court's sentiments are understandable. Nonetheless, fear that a parent may decide to move in the future is not an appropriate basis for modification of a parenting plan.
The Legislature's choice of language in RCW 26.09.260(6) is noteworthy. The statute provides that a hearing to determine whether there is adequate cause for the modification is not required "so long as the relocation is being pursued." Had the Legislature indicated that a showing of adequate cause is not required after relocation is proposed, for example, the trial court's modification of the parenting plan here would have been proper. But the normal requirement of a showing of adequate cause is excused only so long as relocation is being pursued. Where, as here, the parent is no longer pursuing relocation, the parent proposing modification of the parenting plan must show a substantial change in circumstances, considering the factors set forth in RCW 26.09.260(2).[12]
*1174 Grigsby argues that because Rice has appealed from the trial court's order denying relocation, she is still pursuing relocation. But RCW 26.09.260(6) refers only to proceedings before the trial court. Once the trial court denied the relocation, and Rice indicated that she would not relocate without the children, the relocation was no longer being pursued for purposes of RCW 26.09.260(6).
Grigsby also argues that the trial court was not required to believe Rice when she indicated that she would not relocate without the children. But nothing in the record suggests that the trial court did not believe Rice. We do not reach the question of whether a trial court would have the authority to modify a parenting plan when the withdrawal of the request to relocate is disingenuous or made in bad faith because these facts are not before us in this case.
The order modifying the parenting plan is reversed. Grigsby is, of course, free to seek modification of the parenting plan should he be able to establish that there has been a substantial change in the circumstances of the children, that modification is necessary to serve the best interests of the children, and that one or more of the circumstances contained in RCW 26.09.260(2) are present.

Child Support
Rice argues that the trial court erred in eliminating Grigsby's child support obligation based on improper modification of the parenting plan. But Rice did not appeal from the court's child support order. Nor does she assign error to the entry of the order of child support.[13] We therefore do not reach Rice's arguments regarding the child support order.

Attorney Fees
Rice seeks recoupment of her attorney fees from Grigsby and his family on the basis that Grigsby's "parents have financed this litigation and generously support him." The trial court denied an award of fees to either party on the grounds that neither party had the financial ability to pay the other's fees. Rice makes no showing that Grigsby's financial situation has changed. Rice is certainly not entitled to have her fees paid by Grigsby's parents. Rice cites to Chapman v. Perera[14] to support her contention that the involvement of non-parents may be considered in determining whether fees should be awarded. But in Chapman, the grandparents were intervenors. In contrast, the grandparents here were not parties to the proceeding. Rice's request for fees is accordingly denied.
Affirmed in part, reversed in part.
AGID, A.C.J., and COX, J., concur.
NOTES
[1] Bill Grigsby is actually Jon Grigsby's stepfather, but he has been married to Paula Grigsby since Jon was 11 years old.
[2] Apparently, Grigsby's parents are quite wealthy and essentially supported both Grigsby and Rice. They "loaned" Grigsby approximately $100,000 a year. They bought Rice a house, a car, and paid most of her bills.
[3] It is unclear from the record which party initiated the hearing.
[4] Laws of 2000, ch. 21, § 1. In re Marriage of Littlefield, 133 Wash.2d 39, 940 P.2d 1362 (1997); In re Marriage of Pape, 139 Wash.2d 694, 989 P.2d 1120 (1999).
[5] Littlefield, 133 Wash.2d at 55, 940 P.2d 1362.
[6] Pape, 139 Wash.2d at 715, 989 P.2d 1120.
[7] Because this was not a temporary order, factor 11 was inapplicable.
[8] She does not assign error to findings 2.2.4 and 2.2.5 that correspond to the fourth and fifth factors listed in RCW 26.09.520.
[9] In re Marriage of McDole, 122 Wash.2d 604, 610, 859 P.2d 1239 (1993).
[10] The financial situation of her fiancé is not particularly relevant, given that he and Rice are not married.
[11] Court's oral ruling of January 16, 2001.
[12] RCW 26.09.260(2) provides:

In applying these standards, the court shall retain the residential schedule established by the decree or parenting plan unless:
(a) The parents agree to the modification;
(b) The child has been integrated into the family of the petitioner with the consent of the other parent in substantial deviation from the parenting plan;
(c) The child's present environment is detrimental to the child's physical, mental, or emotional health and the harm likely to be caused by a change of environment is outweighed by the advantage of a change to the child; or
(d) The court has found the nonmoving parent in contempt of court at least twice within three years because the parent failed to comply with the residential time provisions in the court-ordered parenting plan, or the parent has been convicted of custodial interference in the first or second degree under RCW 9A.40.060 or 9A.40.070.
[13] Nor is the order among the designated clerk's papers, making review impossible even if the court wished to reach the issue.
[14] Chapman v. Perera, 41 Wash.App. 444, 704 P.2d 1224 (1985).