# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Marriage of:

CRYSTAL D. THACKER (NKA SKOV),

               Respondent,

   and

DAVID M. THACKER,

               Appellant.

No. 85962-5-I

DIVISION ONE

UNPUBLISHED OPINION

COBURN, J. — Three years after David Thacker and Crystol Skov entered into an agreed parenting plan, and two years after a relocation trial where neither party asked to revisit the existing parenting plan, Skov petitioned to modify the parenting plan and place restrictions on David[1] based on a substantial change in circumstances and to protect their children from additional harm. The trial court rejected David's request to limit evidence to a period after entry of the relocation order. In consideration of evidence presented of domestic violence that pre-dated the agreed parenting plan and of more recent emotional and psychological abuse of the children, the trial court suspended David's residential time and restricted his contact with the children. David challenges the trial court's orders modifying the parenting plan and ordering an upward adjustment

---

[1] We refer to David Thacker and his current wife, Julia Thacker, by their first name for clarity because they share the same surname.

in child support following a 14-day trial. Finding no error, we affirm.

FACTS

David and Skov married in 2004. They had three children together, a daughter A.T. and two sons L.T. and G.T.[2] Skov petitioned for dissolution in July 2017.

During the dissolution litigation, Skov requested, under RCW 26.09.191, that the court impose contact restrictions on David. As a result, the dissolution court appointed guardian ad litem (GAL) Kathleen Kennelly to investigate relevant issues, including domestic violence and emotional abuse. Kennelly completed her report in 2018 and did not recommend .191 restrictions. Kennelly's report was not filed with the dissolution court.

In February 2019 the parties entered into an agreed parenting plan that gave the parties joint-decision-making and named Skov as the children's custodian. Under the plan, the parties agreed that Skov would have the majority of the residential time with the children and that, as the parent with majority residential time, Skov was required to notify David if she planned to move to a new school district. The plan further stated that "[i]f the relocating person wants to change the Parenting Plan because of the move, s/he must deliver a proposed Parenting Plan." The dissolution was finalized on June 19, 2019.

In May 2020 Skov petitioned to relocate the children to a new school district within the same county, which the presiding court granted over David's objection in January 2021 following a trial. GAL Kennelly's 2018 report was filed with the relocation court but neither party offered the report or called Kennelly to testify at trial. In its order

---

[2] At the time of the trial in 2023, A.T. was 15 years old, L.T. was 12, and G.T. was nine.

granting relocation, the court expressly recognized that neither party asked to modify the parenting plan because of Skov's proposed relocation and found that the action was "a relocation matter that should be decided under the relocation act." The court found that consideration of the parties' contact with the children was not applicable because neither party sought modification of the parenting plan and their contact would not be disrupted by the move. Additionally, the court found that .191 restrictions on either party did not apply because the current parenting plan order did not include .191 limitations. The parenting plan order, as expressly stated by the trial court's relocation order, "remains in effect."

In April 2022 Skov petitioned to modify the parenting plan, claiming a substantial change in the children's circumstances under RCW 26.09.260(1) and .260(2).[3] Skov asserted that the children's current living situation was harmful to their well-being. Skov also requested restrictions on David as the parent with less parenting or residential time under RCW 26.09.260(4). The court appointed GAL Lynn Tuttle to investigate potential issues regarding a parenting plan for the children, including domestic violence between the parties, emotional or psychological abuse of the children by the parties, and the children's mental health. In June the court issued temporary orders suspending David's in-person visitation with A.T. and L.T.

In May 2023 David moved, under RCW 26.09.260, to limit the scope of testimonial and documentary evidence at trial. David asked the trial court to limit evidence to occurrences on or after the issuance of the relocation order in 2021, arguing that subsection .260(1) prohibited the court from considering allegations

---

[3] David agreed that adequate cause supported a modification of the parenting plan, but for different reasons not relevant in this appeal.

contained in GAL Kennelly's 2018 report because the report was filed with the relocation court and thus rendered the facts "already … 'known' to the trial court for the Relocation trial." David claimed that collateral estoppel barred re-litigation of matters that arose prior to the relocation order. The trial court denied David's motion.

Following a 14-day trial, the court granted Skov's motion to modify the parenting plan. The court issued a written order that incorporated extensive supplemental written findings.

In its supplemental findings, the trial court addressed the procedural history of the case and found that the parties agreed to the existing parenting plan because of GAL Kennelly's 2019 recommendations. Citing Skov's testimony and the 2021 relocation order, the trial court also found that the relocation proceedings did not involve litigation regarding modification of the parenting plan or RCW 26.09.191 limitations. The court found that a substantial change occurred in the children's circumstances under RCW 26.09.260(1) and .260(2) since entry of the agreed parenting plan in 2019. The court found that maintaining the existing plan would be detrimental to the children's physical, mental, and emotional health.

Finding Skov's testimony credible, the court also found that David committed multiple acts of domestic violence against Skov. The court cited GAL Tuttle's concern regarding a consistent pattern of reports that David committed domestic violence in each of his three marital relationships, including against his current spouse Julia Thacker.

The court cited Skov's testimony in its finding that David engaged in emotional abuse of A.T., L.T., and G.T. Skov testified that David would pull on the children's arms

4

and rage-yell or scream at them. Skov described David's rage incidents as "terrifying" and "a norm in our family." Skov testified to an incident in 2013 when L.T. was two years old and playing loudly while David was watching television and David "got in [L.T.'s] face and held onto him" while "rage screaming" in L.T.'s face with an intensity that caused L.T. to start screaming because "it freaked him out." The older the children got, the harder David was on the children.

David's norm of raging and screaming was corroborated by David's adult daughter Ashley from his first marital relationship before Skov.[4] Ashley referred to Skov as her "previous stepmother" with whom she is very close. Ashley moved in with David and Skov around 2006 when she was about eight years old and lived with them until she went to college. Ashley testified that David would scream at L.T. and physically restrain him by laying on top of him or binding his arms and legs while L.T. cried. Ashley also described how David emotionally abused her by berating her when she did not do something like he wanted. David's screaming made Ashley feel like "the worst person on earth."

Relying on testimony from multiple health professionals, school personnel, and Skov, the trial court found that the children demonstrated symptoms of emotional abuse as evidenced by A.T.'s and L.T.'s suicidal ideation since entry of the parties' agreed parenting plan, A.T.'s suicide attempt in 2022, and A.T.'s and L.T's. consistent reports that David was the source of their mental health challenges. The court found that A.T. and L.T. "have been in a mental and emotional crisis since at least January 26, 2022,

---

[4] Ashley was 25 years old at the time of trial.

and that the crisis has been exacerbated by their continued unsupervised contact with [David]."

On January 26, 2022, law enforcement became involved in an incident that started when L.T. refused to get out of Skov's car for residential time with David. David forcefully pulled L.T. out of her car, wrestled with L.T. in the front yard, and pulled L.T. into his house where he continued to wrestle with L.T. on the ground of the foyer. After L.T. subsequently got away and ran out of the house, David caught up to L.T. and picked him up and put him over his shoulder. David then put L.T. on the ground and, with Julia's assistance, held L.T. to the ground. GAL Tuttle concluded in her report that the three children experienced the January 26 incident as a traumatic event that impacted their feelings of safety and heightened the anxiety they already experienced with David. Ex. 342, at 54.

School counselor Melissa Ballard testified that L.T. showed an escalation in challenging behaviors, including "class refusal behaviors, a hard time staying in the classroom or coming into the school building" and problems "getting calm when he had big emotions," in early 2022 and that he reported suicidal ideation in 2022. L.T. reported to Ballard that his negative feelings were triggered because he felt unsafe around David and was scared to go to his house.

Neuropsych evaluator Tammara Bode assessed L.T. and testified that he showed "overt symptoms of [unspecified] trauma" and had attention deficit hyperactivity disorder, depression, and post-traumatic stress disorder.[5] Emergency medicine

---

[5] Bode did not testify as to when her assessment of L.T. occurred but the trial court's written findings place it as occurring sometime prior to L.T.'s evaluation at Seattle Children's Hospital for suicidal ideation in April 2022 (referred to in the following sentence above), which David does not challenge.

physician Dr. Hiromi Yoshida evaluated L.T. at Seattle Children's Hospital for suicidal ideation in April 2022 and testified that L.T. reported he did not feel safe in his father's care, observed his father be aggressive toward his stepmother, described his father's house as a "big stressor," and asked to be discharged to his mother's care.

Dr. Daniel Crawford, psychiatrist at Seattle Children's Hospital, testified that A.T. was admitted to the hospital for attempting suicide in spring 2022 and diagnosed with depressive disorder. A.T. expressed to Dr. Crawford that she "found it very difficult to be at her father's home" and "she had tried to kill herself because she was about to go to her father's home per the current [residential schedule] and she did not think she could bear that." According to Dr. Crawford, A.T. "expressed multiple plans for how to end her life should she have to return to her father's house." Two other medical professionals who cared for A.T. after her hospitalization at Seattle Children's Hospital testified that she suffered from anxiety and depression, and that her symptoms were directly related to being in David's care. School counselors testified to A.T. expressing she did not want to go home with her father and showing fear of him, including Julianna Jenkins who observed A.T. in a "panic" and hiding under a school desk when David arrived to pick her up from school.

G.T. described his father as "really abusive" and said that "[h]e abuses the power of a grown-up." Ex. 342, at 34. G.T. expressed that his father's house was "scary" and that none of the children want to go there "in case he gets mad." Id. Like A.T. and L.T., G.T. described their father's "yelling [at the children] and screaming at them and being unpredictable."

7

GAL Tuttle testified that David's yelling caused a lot of fear and anxiety for the children and created a stressful environment for them. The children reported observing domestic violence between their father and Julia, including David being physical with her, locking her out of the house, and breaking a laptop. Tuttle reported that David's behavior constituted emotional abuse of the children.

The trial court found that the children needed mental health treatment and "time to heal from their traumas relating to David's parenting, his exposing them to domestic violence, and his emotional abuse while parenting them." The court adopted GAL Tuttle's recommendation to modify the parenting plan and restrict David's contact with A.T. and L.T. based on domestic violence and emotional abuse. Ex., 342 at 61. Additionally, the court found that G.T. "is just as affected by the exposure to domestic violence and emotional abuse at the hands of his father" and determined it would not wait for G.T.'s mental health to decline like A.T., L.T., and David's adult daughter Ashley, who testified to struggling with suicidal ideation and self-harming behaviors when she was a child in his care. The court restricted David's contact with the children under RCW 26.09.260(4) to protect the best interests of the children, stating:

> Without treatment addressing his rage, domestic violence, and emotional abuse, and without limitations on his ability to physically compel any of his children to attend visits, David is not fit to parent his children as he is not capable of providing a home that is free from emotional abuse and domestic violence. As such, the Court finds it is necessary to restrict contact between David and all three children and that restricting his contact protects the best interests of the children under RCW 26.09.191.

The court suspended David's residential time with the children pending his compliance with domestic violence intervention treatment and a parenting program.

8

Additionally, the trial court approved Skov's request for an adjustment in child support. Based on its consideration of various factors, the court concluded an increased adjustment above the standard monthly calculation of $2,382.60 was necessary to meet the children's needs and commensurate with the parties' income, resources, and standard of living under RCW 26.19.001. The court ordered David to pay $3,500 in monthly child support to Skov.

David appeals.

DISCUSSION

Modification of Parenting Plan

*A.  Standard of Review*

Generally, "trial courts are given broad discretion in matters dealing with the welfare of children." In re Marriage of McDole, 122 Wn.2d 604, 610, 859 P.2d 1239 (1993). A trial court's order modifying a parenting plan is reviewed for abuse of discretion. In re Marriage of Kinnan, 131 Wn. App. 738, 746, 129 P.3d 807 (2006).

David asserts that his challenge to the trial court's modification of a parenting plan requires this court to engage in statutory interpretation to determine whether a relocation order constitutes a custody decree under RCW 26.09.260(1). Accordingly, he avers that we should review the issue de novo. We disagree.

RCW 26.09.260(1) states,

> Except as otherwise provided in subsections (4), (5), (6), (8), and (10) of this section, the court shall not modify a prior custody decree or a parenting plan unless it finds, upon the basis of facts that have arisen since the prior decree or plan or that were unknown to the court at the time of the prior decree or plan, that a substantial change has occurred in the circumstances of the child or the nonmoving party and that the modification is in the best interest of the child and is necessary to serve the best interests of the child.

9

David makes a tortured argument that the trial court misapplied subsection .260(1) when it considered facts prior to the relocation order in its decision to modify the agreed parenting plan. David asserts that the relocation order constitutes a "custody decree" that should have narrowed the court's scope of inquiry to only include events that arose after entry of the relocation order in 2021. By attacking the trial court's scope of inquiry at the modification trial, David merely attempts to revive a challenge to the court's evidentiary rulings. Skov argues that because David did not ask the trial court to find that the relocation order was a custody decree for the purpose of the court's application of RCW 26.09.260(1), he waived this argument under RAP 2.5(a).

Prior to the modification trial, David moved to limit the scope of evidence under RCW 26.09.260(1), which the trial court denied. At that time, David did not argue that the relocation order should be considered a custody decree under .260(1). He does not show that he raised this argument below. See RAP 2.5(a), 10.3(a)(6); State v. Scott, 110 Wn.2d 682, 685, 757 P.2d 492 (1988) ("The appellate courts will not sanction a party's failure to point out at trial an error which the trial court, if given the opportunity, might have been able to correct to avoid an appeal and a consequent new trial.") (citing Seattle v. Harclaon, 56 Wn.2d 596, 597, 354 P.2d 928 (1960)). Moreover, David does not assign error to the trial court's denial of his motion to limit the scope of evidence or any of the court's evidentiary rulings during the modification proceedings. We conclude that David waived his argument challenging the trial court's scope of inquiry under RCW 26.09.260(1), and review the trial court's order modifying the parties' agreed parenting plan for abuse of discretion.

*B. No Abuse of Discretion*

An abuse of discretion occurs when a decision is manifestly unreasonable or based on untenable grounds or untenable reasons. In re Marriage of Katare, 175 Wn.2d 23, 35, 283 P.3d 546 (2012). "'[A] reviewing court may not find abuse of discretion simply because it would have decided the case differently—it must be convinced that no reasonable person would take the view adopted by the trial court.'" Gilmore v. Jefferson County Pub. Transp. Benefit Area, 190 Wn.2d 483, 494, 415 P.3d 212 (2018) (internal quotation marks omitted) (quoting State v. Salgado-Mendoza, 189 Wn.2d 420, 427, 403 P.3d 45 (2017)).

We uphold a trial court's findings of fact in its order modifying a parenting plan so long as such findings are supported by substantial evidence. In re Marriage of Hansen, 81 Wn. App. 494, 498, 914 P.2d 799 (1996). Substantial evidence is "defined as a quantum of evidence sufficient to persuade a rational fair-minded person the premise is true." In re Marriage of DeVogel, 22 Wn. App. 2d 39, 48, 509 P.3d 832 (2022) (quoting Sunnyside Valley Irrig. Dist. v. Dickie, 149 Wn.2d 873, 879, 73 P.3d 369 (2003)). The party challenging the court's findings has the burden of showing that substantial evidence does not exist. In re Marriage of Grigsby, 112 Wn. App. 1, 9, 57 P.3d 1166 (2002). An appellate court will not supplant a trial court's determination as to the persuasiveness of evidence, even where conflicting, or the credibility of witnesses. In re Marriage of Black, 188 Wn.2d 114, 127, 392 P.3d 1041 (2017); In re Marriage of Bundy, 12 Wn. App. 2d 933, 938, 460 P.3d 1111 (2020). "So long as substantial evidence supports the finding, it does not matter that other evidence may contradict it." Burrill v. Burrill, 113 Wn. App. 863, 868, 56 P.3d 993 (2002). A trial court's unchallenged findings

of fact are verities on appeal. <u>In re Marriage of Vander Veen</u>, 62 Wn. App. 861, 865, 815 P.2d 843 (1991).

Once a court finds adequate cause to schedule a parenting plan modification hearing under RCW 26.09.270, the trial court may then modify the existing parenting plan under RCW 26.09.260(1) if it finds that a substantial change has occurred in the child's circumstances and the modification is in and necessary for the best interests of the child. Subsection .260(1) provides a timing provision wherein the court is authorized to consider in its modification determination "'facts that have arisen since <u>the prior [parenting] plan</u>' and 'that were unknown to the court at the time of <u>the prior [parenting] plan</u>.'" <u>In re Marriage of Zigler</u>, 154 Wn. App. 803, 811, 226 P.3d 202 (2010) (alteration in original) (quoting RCW 26.09.260(1)). "'Unknown' facts <u>include</u> those facts that existed before an <u>agreed</u> parenting plan was entered." <u>Id.</u> (second emphasis added) (citing <u>In re Marriage of Timmons</u>, 94 Wn.2d 594, 598-99, 617 P.2d 1032 (1980)).

The trial court also may alter "the residential schedule established by … the parenting plan" based on a finding under RCW 26.09.260(2), such as a finding that the present environment is detrimental to the child's physical, mental, or emotional health and the advantage of a change in the child's environment outweighs the harm likely to be caused by the change in environment. RCW 26.09.260(2)(c). Additionally, under RCW 26.09.260(4), "[t]he court may reduce or restrict contact between the child and the parent with whom the child does not reside a majority of the time if it finds that the reduction or restriction would serve and protect the best interests of the child using the criteria in RCW 26.09.191 and 26.09.192." As plainly shown by the "except as otherwise provided" language of RCW 26.09.260(1), the basis for a court's finding regarding

12

contact reduction or restriction for a parent with less than the majority of residential time under subsection .260(4) is not limited to facts that have arisen since or were unknown by the court at the time of the prior parenting plan.

Here, it is undisputed that the parties agreed to the parenting plan that was entered as part of their dissolution in 2019. David's argument in his briefing that the relocation court had reconsidered the parties' parenting plan is unpersuasive. As expressly acknowledged in the relocation court's order, neither party petitioned to modify the plan when Skov's relocation request was litigated. Indeed, the relocation court deemed that the matter before it fell under Washington's child relocation act.[6]

After finding adequate cause and holding a 14-day trial, the trial court found a substantial change in the children's circumstances based on their suffering of emotional abuse from David's parenting and determined that modification of the parenting plan was in the children's best interests under RCW 26.09.260(1) and .260(2). For this same reason, the court restricted David's contact with the children as the parent with less than the majority of the parenting time under RCW 26.09.260(4).

David specifically challenges some of the trial court's purported "key findings" in its modification order. In addition to reviewing challenged findings for substantial evidence, "we look at the evidence and reasonable inferences therefrom in the light most favorable to the respondent." Zigler, 154 Wn. App at 812.

---

[6] Codified under RCW 26.09.405-.560. See Cowan v. Cowan, 29 Wn. App. 2d 355, 379, 540 P.3d 158 (2023), review denied, 2 Wn.3d 1020, 542 P.3d 578 (2024) ("The child relocation act (CRA) 'governs the process for relocating the primary residence of a child who is the subject of a court order for residential time.'") (quoting In re Marriage of Abbess, 23 Wn. App. 2d 479, 485-86, 516 P.3d 443 (2022)).

David argues that the trial court erred in its finding that A.T.'s and L.T.'s suicidality occurred during his residential time. David bases his challenge on an isolated phrase in the court's findings, citing the court's statements that three out of four of the children experienced "suicidality and/or self-harm behaviors … while they were in [David's] care," and that Ashley, A.T., and L.T. "had suicidal ideation and self-harming behaviors while in David's care." (Emphasis added.) David literally construes "while in David's care" to mean that the court assigned the children's suicidal ideation and self-harming behavior to David's scheduled residential time. However, these findings in combination with the court's findings about the children's mental health challenges can be reasonably understood as attributing A.T.'s and L.T.'s suicidal ideation to their fear and anxiety about being returned to David's care. This is supported by substantial evidence in the record, including testimony regarding specific crisis incidents when A.T. and L.T. expressed anxiety and/or fear[7] about going with David or returning to his house.

David next claims that the trial court incorrectly concluded that he has been "the only adult who has needed to carry L.T. out of a car when [L.T.] is activated."[8] (Emphasis added.) David seems to extend the trial court's finding that he was the only adult who physically restrained L.T. as discipline to include the incident on January 26, 2022, during which David pulled L.T. out of the car and into his house.

---

[7] Because he raises it for the first time in his reply brief, we do not consider David's claim that the court "misattributed [statements] to L.T." when Skov was the source of the statements. Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

[8] It is apparent from David's argument that "when [L.T.] is activated" refers to times when L.T. would exhibit challenging behaviors, such as refusing to go to visits with David because of L.T.'s "severe attachment anxiety."

Even interpreting the trial court's finding this way, David fails to establish that the court abused its discretion. The court heard testimony from GAL Tuttle that the children suffered from emotional abuse from David in part based on the incident on January 26, 2022 when David "pulled [L.T.] out of the car and held him on the floor" as well as reports from A.T. and L.T. that David would grab the children and Ashley's description of incidents in which David would slam her against the wall by the shoulders, carry A.T. or L.T. by the arm, and hold or lay on top of L.T. Ashley testified it was difficult to observe David lay on top of L.T. or bind L.T.'s arms and legs with his full body weight while L.T. cried. Ashley said that L.T. had some behavioral issues and challenges controlling his emotions, but that "no one else in the house treated [L.T.] like that." David does not provide record cites to establish an incident where a different adult carried L.T. out of the car or physically restrained him. David points to Skov's statement to GAL Kennelly that L.T. would sometimes need to be physically dragged out of the car for visits with David. Ex. 447, at 16. But Skov's general statement did not identify who was pulling L.T. out of the car.[9] David has thus not met his burden to show that substantial evidence does not exist on this record. See Grigsby, 112 Wn. App. at 9.

We also disagree with David's claim that the trial court's rationale for terminating David's visits "immediately and indefinitely" is not supported by the record. The court did not restrict David's contact with the children indefinitely. Rather, finding that the children's best interest required contact restrictions under RCW 26.09.191, the court imposed a detailed phased plan predicated on David's compliance with domestic

---

[9] GAL Kennelly's report states in relevant part, "The mother maintains …. [that L.T.] alternates between being okay with the visits and having to be physically dragged out of the car – [L.T.] has had severe attachment anxiety with me in the last six months.'" Ex. 447, at 16.

15

violence evaluation, treatment recommendations, and a parenting course. Based on testimony from Skov, Ashley, school personnel, and medical professionals, the record supports the trial court's finding that the children suffered from emotional abuse as a result of David's parenting and that it was thus in the children's best interest not to have contact with David until he engaged in interventions for his rage and abusive behaviors. We thus do not disturb the trial court's finding that the evidence necessitated the phased restriction of David's contact with the children under RCW 26.09.191.

Finally, David asserts that the trial court erroneously found that he did not rebut certain portions of Skov's testimony and asks this court to reweigh evidence, which we do not do.[10] Black, 188 Wn.2d at 127; Bundy, 12 Wn. App. 2d at 938.

We conclude that the trial court did not abuse its discretion in modifying the parties' parenting plan.

Child Support Order

David contends that the trial court erred by ordering an adjustment over the standard calculation in his monthly child support payments. He asserts that the trial court relied on generalities and trivial evidence in its determination that Skov's child-related costs will increase based on the fact that the children will reside with her 100 percent of the time under the modified parenting plan. We disagree.

We review a trial court's decision on child support for manifest abuse of discretion and recognize that such decisions are rarely disturbed on appeal. In re

---

[10] In his opening brief, David assigned error without substantive argument "to any and all [of the trial court's] findings and conclusions" that are "substantially similar" to the challenged findings addressed herein. Because David did not provide argument for any of these "substantially similar" findings—much less identify what they are—we need not further address findings and conclusions other than those discussed in this opinion. See RAP 10.3(a)(6).

<u>Marriage of Booth</u>, 114 Wn.2d 772, 776, 791 P.2d 519 (1990); <u>In re Marriage of Fiorito</u>, 112 Wn. App. 657, 663-64, 50 P.3d 298 (2002). A manifest abuse of discretion occurs where the court's decision is outside the range of acceptable choices given the facts and the applicable legal standard, the court's decision is based on an incorrect standard or improper facts given the correct standard, or the court's factual findings are unsupported by the record. <u>Fiorito</u>, 112 Wn. App. at 664. An appellate court will not substitute our own judgment for the trial court's where the record shows the court considered all relevant factors and the award is not unreasonable under the circumstances. <u>Id.</u>

Washington's child support statute is intended to ensure that "child support orders are adequate to meet a child's basic needs and to provide additional child support commensurate with the parents' income, resources, and standard of living." RCW 26.19.001. When determining the amount of child support, the trial court starts with the statute's economic table in the child support schedule, which is presumptive for combined monthly net incomes up to and including $12,000. RCW 26.19.011(1), .020, .065(3). Above the $12,000 threshold, trial courts have discretion to "exceed the presumptive amount" of child support upon written findings of fact. RCW 26.19.065(3). So long as the trial court considers the parents' standard of living and the children's special medical, educational, or financial needs, the court is neither required to use any specific method in determining an amount that exceeds the economic table nor limited in its consideration of other relevant factors based on the circumstances. <u>See</u> <u>McCausland v. McCausland</u>, 159 Wn.2d 607, 616-17, 620, 152 P.3d 1013 (2007).

In the instant case, the trial court found that based on the parties' stipulated incomes, their combined monthly net incomes totaled more than $45,000 and thus was not contemplated by the statutory economic table. The court found that an upward adjustment of the standard calculation of child support was necessary to provide Skov with sufficient funds to raise the children and meet their special needs as the parent with 100 percent of the residential time. Additionally, the court determined that David had the ability to provide for the increased adjustment in child support.

David does not dispute the trial court's authority to adjust the monthly child support to an amount higher than the standard calculation under RCW 26.19.065(3) and does not challenge the court's findings regarding his income, assets, and liabilities. He also does not argue that the court failed to satisfy the minimum requirements of issuing written findings and to consider the parties' standard of living and the children's special needs as part of its award determination under subsection .065(3).

He instead challenges the trial court's finding that Skov's childcare expenses will necessarily increase by having the children on a full-time basis, asserting that the trial court erred in its comparison of Skov's expenses in 2018 to 2022 when she began to care for the children 100 percent of the time. However, a review of the court's findings shows that it made no such comparison. Nor was it required to. See McCausland, 159 Wn.2d at 616-17.

In its child support order, the trial court stated that Skov's residential costs have increased because of the necessary care she provides for the three children and that the children have special needs, which amplifies such necessary care. The court cited Skov's testimony wherein she stated that total child-related expenses have increased

18

since she began having the children on a full-time basis in 2022, including day-to-day living costs for utilities, food, gas, and clothing. Skov testified that her overall costs related to the children increased by about $1,300 a month. The court also observed that, based on her testimony, Skov "was really struggling" in 2022 and that the children "barely did anything" in 2022. Skov hoped the children would participate in more activities based on their new engagement in therapy. Thus, reviewing the record in a light most favorable to Skov, we conclude the record supports the trial court's reasonable conclusion that Skov's childcare expenses will increase based on her role as the parent with 100 percent of the residential time. See In re Marriage of Kaplan, 4 Wn. App. 2d 466, 479, 421 P.3d 1046 (2018) ("'In determining whether substantial evidence exists to support a court's finding of fact, the record is reviewed in the light most favorable to the party in whose favor the findings were entered.'") (quoting In re Marriage of Gillespie, 89 Wn. App. 390, 404, 948 P.2d 1338 (1997)).

The child support order shows that the court considered an increase in Skov's child-related expenses in light of the parties' financial resources. The court referred to its supplemental written findings, wherein it found a disparity in the parties' income, with David's income being more than six times Skov's and accounting for 86 percent of the parties' combined monthly incomes. Based on her 2023 financial declaration, the court found that, excluding her personal and unidentified expenses, Skov could not afford $2,000 of her monthly expenses based on her income. The court also found that compared to David's $507,500 in liquid assets and multiple properties, Skov had more than $30,000 in credit card debt with $9,000 in liquid assets.[11]

[11] Because he does provide any supporting authority, we reject David's complaint that it was improper for the trial court to consider Skov's litigation expenses as part of its consideration

Lastly, David argues that the trial court's finding that Skov's child-related costs will increase is inconsistent with his and Julia's double insurance coverage and the court's determination that he is responsible for his proportional share of any uninsured medical expenses and educational expenses as well as 100 percent of therapeutic visit costs.

David disregards the part of the trial court's findings where it acknowledges the adjusted child support award was "not inclusive of the children's costs for unreimbursed medical care," schooling costs, or "necessary educational, behavioral, and other psychological assessments and treatment." The court ordered David and Skov to pay their proportional share of these costs that exceed "costs associated with raising children." Viewed in the light most favorable to Skov and in context, the court's findings indicate that the upward adjustment in child support addresses, in addition to the children's basic needs, day-to-day costs associated with raising children that may be related to medical and psychological treatment, such as the cost of gas required to transport the children to various appointments.

The court had wide-reaching discretion to determine a child support amount beyond the statutory economic table based on a consideration of relevant factors, including the parties' standard of living and the children's special needs. Under such circumstances, we cannot say that the trial court's award of $3,500 in monthly child support, which encompassed an upward adjustment of $372 for each child above the standard monthly calculation, was unreasonable or not supported by sufficient

of her financial constraints. See Peterson v. Dep't of Lab. & Indus., 17 Wn. App. 2d 208, 237, 485 P.3d 338 (2021) ("Where a party does not cite to such authority, we assume there is none.").

20

evidence. See Booth, 114 Wn.2d at 776. David has not established that the trial court manifestly abused its discretion in increasing the child support award.

Attorney Fees on Appeal

Both parties request attorney fees and costs on appeal under RCW 26.09.140. We may award fees on appeal if the "applicable law grants to a party the right to recover reasonable attorney fees or expenses on review" and the party properly requests it. RAP 18.1(a)-(b). In determining whether to grant attorney fees on appeal under RCW 26.09.140, we consider "'the parties' relative ability to pay' and 'the arguable merit of the issues raised on appeal.'" In re Marriage of Muhammad, 153 Wn.2d 795, 807, 108 P.3d 779 (2005) (quoting In re Marriage of Leslie, 90 Wn. App. 796, 807, 954 P.2d 330 (1998)). Generally, costs are awarded to the party who substantially prevails on review. RAP 14.2.

Here, the merit of the issues on appeal supports granting fees on appeal to Skov. Additionally, she filed a financial affidavit in compliance with RAP 18.1(c) that demonstrates modest income and financial distress by way of monthly expenses that exceed her monthly income. David did not counter with an affidavit proving his inability to pay. Therefore, we grant Skov's request for attorney fees and costs on appeal and set the matter before a commissioner of this court for a determination of the appropriate amount consistent with RAP 18.1(f).

CONCLUSION

We affirm.[12]

_Coburn, J._

WE CONCUR:

_Feldman, J._                    _Mann, J._

---

[12] Because we affirm the trial court's orders modifying the parenting plan and adjusting child support, we need not consider David's argument that this matter should be heard by a different judicial officer on remand.